IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SCANNED AT CCI and E-Mailed
to USDC OHSD on _11/20/18_,
20_18_by _CPummill_

No. of Pgs. _132_

MARK GROVE
Prison Inmate Number: A183624
Chillicothe Correctional Institution (CCI)
15802 State Route 104 North
Post Office Box 5500
Chillicothe, Ohio 45601

       Plaintiff,

**vs.**

GARY C. MOHR, DIRECTOR
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

       Defendant,

and,

ANDREW EDDY, MD, Director Medical
Collegial Review Board
& Chief Medical Officer
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

       Defendant,

and,

JOHN GARDNER, MD, Member
Collegial Review Board
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

       Defendant,

Case No:   2:18-CV-1492

Judge Alegenon L. Marbley
Magistrate Judge Elizabeth Preston Deavers

COMPLAINT
Demand for Jury Trial

1a

and,

MS. BOTTORFF, Nurse Practitioner (NP)
London Correctional
Institution (LoCI)
1580 State Route 56
London, Ohio 43140

        Defendant,

and,

ABID I. RANA, MD
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

        Defendant,

and,

LARRY HOUTS, MD
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

        Defendant,

and,

GARY ARTRIP, Nurse Practitioner (NP)
Chillicothe Correctional Institution (CCI)
15802 State Route 104 North
Post Office Box 5500
Chillicothe, Ohio 45601

        Defendant,

and,

BETH HIGGINBOTHAM, Healthcare
Administrator (HCA)
Chillicothe Correctional Institution (CCI)
15802 State Route 104 North
Post Office Box 5500
Chillicothe, Ohio 45601

        Defendant,

and,

CORBY FREE, Institutional Inspector
Chillicothe Correctional Institution (CCI)
15802 State Route 104 North
Post Office Box 5500
Chillicothe, Ohio 45601

        Defendant,

and,

GARY KRISHER, MD, Member
Collegial Review Board
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

        Defendant,

and,

JOHN DESMARIAS, MD, Medical
Director
Ohio Department of Rehabilitation
And Correction (ODRC)
770 West Broad Street
Columbus, Ohio 43222

        Defendant,

and,

1c

HISHAM M. AWAN, MD (Hand Surgeon)
Franklin Medical Center, Zone A (FMC)
1990 Harmon Avenue 43223-3829
Post Office Box 23658
Columbus, Ohio 43223-3658

       Defendant,

and,

EDWARD A. MICHELSON, MD
Ohio State University
Medical Center (OSUMC)
410 West 10th Avenue
Columbus, Ohio 43210

       Defendant,

and,

ANDREW J. KRIEGER, MD
Ohio State University
Medical Center (OSUMC)
410 West 10th Avenue
Columbus, Ohio 43210

       Defendant,

and,

ROBERT C. RYU, MD
Ohio State University
Medical Center (OSUMC)
410 West 10th Avenue
Columbus, Ohio 43210

       Defendant,

and,

JOSEPH S. YU, MD
Ohio State University
Medical Center (OSUMC)
410 West 10th Avenue
Columbus, Ohio 43210

       Defendant,

1d

and,

UNKNOWN
JANE AND/ OR JOHN DOE (X 50)
ADDRESS UNKNOWN

      Defendant.

IF YOU ARE A PRISONER FILING A CIVIL SUIT THE FOLLOWING INFORMATION IS REQUIRED:

PREVIOUS LAWSUITS:

A.  HAVE YOU BEGUN OTHER LAWSUITS IN STATE OR FEDERAL COURT DEALING WITH THE SAME FACTS INVOLVED IN THIS ACTION OR OTHERWISE RELATING TO YOUR IMPRISONMENT? YES (✓) NO ( )

B.  IF YOUR ANSWER TO A IS YES, DESCRIBE THE LAWSUIT IN THE SPACE BELOW. (IF THERE IS MORE THAN ONE LAWSUIT, DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THE SAME OUTLINE.)

1.  PARTIES TO THIS PREVIOUS LAWSUIT

PLAINTIFFS:

_Hill et.al. (John Hill; Darrell Stephens; Mark Grove; William Ridenour and six (6) other Ohio O.D.R.C. Inmates.)_

DEFENDANTS:

_Wilkinson, et.al. (Reginald Wilkeson; Jhon F Kinkela; Margarette T. Ghee.)_

2.  COURT (IF FEDERAL COURT, NAME THE DISTRICT: IF STATE COURT, NAME THE COUNTY)

_Southern District of Ohio_

3.  DOCKET NUMBER

_00-00142_

4.  NAME OF THE JUDGE TO WHOM THE CASE WAS ASSIGNED

_George C. Smith_

5.  DISPOSITION (FOR EXAMPLE, WAS THE CASE DISMISSED? WAS IT APPEALED? IS IT STILL PENDING?)

_Dismissed, Appeal Remanded for further processing_

6.  APPROXIMATE DATE OF THE FILING OF THE LAWSUIT

_February 10, 2000_

7.  APPROXIMATE DATE OF THE DISPOSITION

_November 30, 2005_

PLACE OF PRESENT CONFINEMENT

A. IS THERE A PRISONER GRIEVANCE PROCEDURE IN THIS INSTITUTION?
   YES (✓) NO ( )

B. DID YOU PRESENT THE FACTS RELATING TO YOUR COMPLAINT IN THIS STATE
   PRISONER GRIEVANCE PROCEDURE? YES (✓) NO ( )

C. IF YOUR ANSWER IS YES:

   1. WHAT STEPS DID YOU TAKE?

   Informal Complaint Resolution, Grievances
   Appeal to Chief Inspector (ongoing
   deliberate indifference).

   2. WHAT WAS THE RESULT?

   Denie relief requested.

D. IF YOUR ANSWER IS NO, EXPLAIN WHY NOT.

E. IF THERE IS NO PRISON GRIEVANCE PROCEDURE IN THIS INSTITUTION, DID
   YOU COMPLAIN TO PRISON AUTHORITIES? YES ( ) NO ( )

F. IF YOUR ANSWER IS YES:

   1. WHAT STEPS DID YOU TAKE?

   2. WHAT WAS THE RESULT?

Plaintiff, Mark Grove, in pro se, hereby files this First Amended Complaint and avers as follows:

**NATURE OF THE SUIT**

1. Plaintiff brings this action to redress violations by defendants of Plaintiff's rights under the Constitutions and laws of the United States and State of Ohio.

2. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of statute, ordinance, regulations, custom, or usage of rights, privileges, and immunities secured to Plaintiff by the Eighth Amendment to the Constitution of the United States, namely, the right to be free from the unnecessary and wanton infliction of pain and substantial risk of serious harm by defendants acting with deliberate indifference to Plaintiff's serious medical needs. Plaintiff is seeking individual damages from Defendants pursuant to the Constitution and laws of the United States. Plaintiff prays also for injunctive and declaratory relief against the conditions and practices of the Ohio Department of Rehabilitation and Correction and its agents, servants and/or employees as violative of the federal constitutional guarantees and rights of plaintiff. In addition, plaintiff invokes the pendent jurisdiction of this Court over related, ancillary, and pendent state law claims. Plaintiff is further seeking individual damages from Defendants pursuant to the laws of the State of Ohio, providing liability for tortious conduct and breach of contract. State and federal claims set forth below derive from a common nucleus of operative facts so that this court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. This action is also brought for fraud. Finally, Plaintiff seeks an award of attorney's fees and cost pursuant to 42 U.S.C. § 1988.

**JURISDICTION AND VENUE**

3. The jurisdiction of this Court is invoked pursuant to the Federal Civil Rights Act, 42 U.S.C. §§ 1983 and 1988; Judicial Code 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States, and supplemental jurisdiction as codified in 28 U.S.C. § 1367(a).

4. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Thus, this matter is properly brought to the United States District Court for the Southern District of Ohio, Eastern Division, under 28 U.S.C. § 1391(b).

5. This Court is authorized to render declaratory and injunctive relief pursuant to the Eighth Amendment, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

6. Plaintiff has complied with all conditions precedent to the filing of this suit required by 42 U.S.C. § 1997e(a). Plaintiff timely and properly exhausted the three-step grievance procedure set forth in Ohio Admin. Code § 5120-9-31 by filing an informal complaint, a formal grievance and an appeal to the Chief Inspector of the Ohio Department of Rehabilitation and Correction.

7. All administrative prerequisites have been satisfied and this suit is timely filed.

**PARTIES**

8. I, Plaintiff Mark Grove, (hereinafter "Plaintiff" and /or "I") am a citizen of the United States, a resident of Ross County Ohio and an indigent prisoner incarcerated under the custody and control of the Ohio Department of Rehabilitation and Correction (ODRC) pursuant to Ohio Revised Code § 5120.16 since March 04, 1985. Plaintiff is and was at all times relevant herein held in the Chillicothe Correctional Institution (CCI), 15802 St. Rte. 104 North, P.O. Box 5500, Chillicothe, Ohio 45601. Plaintiff's age is 61.

9. Defendant Gary C. Mohr (hereinafter "Defendant Mohr" and/or "Director Mohr") is and was at all times relevant herein the Director of the Ohio Department of Rehabilitation and Correction (hereinafter "ODRC"), which is an entity of the State of Ohio. In his capacity as Director of the ODRC, Defendant Mohr has a duty under Federal and State Law to provide adequate health care to Plaintiff and all other prisoners under the custody and control of the ODRC and he is and was responsible for establishing or failing to establish the policies, practices, regulations, customs and usage for the conduct of the ODRC and its agents, servants and employees. Defendant Mohr is and was at all times relevant herein constitutionally and statutorily responsible also for the operations, practices, customs, usage and totality of conditions of the ODRC. Defendant Mohr is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official capacity and individual capacity for actions he personally committed.

10. Defendant Andrew Eddy, M.D. (hereinafter "Defendant Eddy" and/or "Dr. Eddy") is and was at all times relevant herein the ODRC's Chief Medical Director and Director of its Collegial Review Board. Defendant Eddy is and was at all times relevant herein acting in such capacity as the agent, servant and

6a

employee of the ODRC. He is sued in his official and individual capacity for actions he personally committted.

11. Defendant John Gardner, M.D. (hereinafter "Defendant Gardner" and/or "Dr. Gardner") is and was at all times relevant herein a member of the ODRC's Collegial Review Board. Defendant Gardner is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

12. Defendant, Ms. Bottorff, N.P., hereinafter Defendant Bottorff and/or N.P. Bottorff, is and was at all times relevant herein, a nurse practitioner at the ODRC's CCI. Defendant Bottorff is and was at all times relevant herein acting in such capacity at the agent, servant and employee of the ORDC. She is sued in her official and individual capacity for actions she personally committed.

13. Defendant Abid I. Rana, M.D. (hereinafter "Defendant Rana" and/or "Dr. Rana") is and was at all times relevant herein a doctor at the ODRC's Chillicothe Correctional Institution (hereinafter "CCI"). Defendant Rana is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally comitted.

14. Defendant Lary Houts, M.D. (hearinafter "Defendant Houts" and/or "Dr. Houts)" is and was at all times relevant herein a doctor at the ODRC's CCI. Defendant Houts is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally comitted.

15. Defendant Gary Artrip, N.P. (hereinafter "Defendant Artrip" and/or "NP Artrip") is and was at all times relevant herein a nurse practioner at the

6b

ODRC's CCI. Defendant Artrip is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

16. Defendant Beth Higginbotham, HCA (hereinafter "Defendant Higginbotham" and/or "HCA Higginbotham") is and was at all times relevant herein the Health Care Administrator at the ODRC's CCI. Defendant Higginbotham is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. She is sued in her official and individual capacity for actions she personally committed.

17. Defendant Corby Free, Inst. Insp. (hereinafter "Defendant Free" and/or "Insp. Free") is and was at all times relevant herein the Institutional Inspector at the ODRC's CCI. Defendant Free is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

18. Defendant Gary Krisher, M.D. (hereinafter "Defendant Krisher" and/or "Dr. Krisher") is and was at all times relevant herein a member of the ODRC's Collegial Review Board. Defendant Krisher is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

19. Defendant John Desmarias, Medical Director (hereinafter "Defendant Desmarias") is and was at all times relevant herein the ODRC's Medical Director. Defendant Desmarias is and was at all times relevant herein acting in such capacity as the agent, servant, and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

6c

20.     Defendant Hisham M. Awan, M.D. (hereinafter "Defendant Awan" and/or "Dr. Awan") is and was at all times relevant herein the Hand Surgeon at the ODRC's Franklin Medical Center (hereinafter "FMC") Hand Clinic and the Ohio State University Wexner Medical Center (hereinafter "OSUMC"). Defendant Awan is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the ODRC. He is sued in his official and individual capacity for actions he personally committed.

21.     Defendant Edward A. Michelson, M.D. (hereinafter "Defendant Michelson" and/or "Dr. Michelson") is and was at all times relevant herein a doctor at the Ohio State University Wexner Medical Center (hereinafter "OSUMC"). Defendant Michelson is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the OSUMC and the ODRC. He is sued in his official and individual capacity for actions he personally committed.

22.     Defendant Andrew J. Krieger, M.D. (hereinafter "Defendant Krieger" and/or "Dr. Krieger") is and was at all times relevant herein a doctor at the Ohio State University Wexner Medical Center (hereinafter "OSUMC"). Defendant Krieger is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the OSUMC and the ODRC. He is sued in his official and individual capacity for actions he personally committed.

23.     Defendant Robert C. Ryu, M.D. (hereinafter "Defendant Ryu" and/or "Dr. Ryu") is and was at all times relevant herein a doctor at the Ohio State University Wexner Medical Center (hereinafter "OSUMC"). Defendant Ryu is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the OSUMC and the ODRC. He is sued in his official and individual capacity for actions he personally committed.

24.     Defendant Joseph S. Yu, M.D. (hereinafter "Defendant Yu" and/or "Dr. Yu") is and was at all times relevant herein a doctor at the Ohio State University Wexner Medical Center

(hereinafter "OSUMC"). Defendant Yu is and was at all times relevant herein acting in such capacity as the agent, servant and employee of the OSUMC and the ODRC. He is sued in his official and individual capacity for actions he personally committed.

25.    Defendants John and or Jane Does 1 through 50 (hereinafter Defendant Does 1-50) are herein sued under fictitious names because their names are presently unknown to Plaintiff. At all times relevant herein, they are agents, servants and employees of the ODRC and the OSUMC, and in such capacity directly and personally violated the Plaintiff's civil rights. At all times relevant herein, the OSUMC Defendant Does 1-50 are agents, servants and employees of the ODRC by contract between the ODRC and the OSUMC. The Plaintiff has diligently and in good faith attempted to ascertain the true names of Defendants Does 1-50, but as of yet has been unsuccessful due to the limited discovery powers afforded the Plaintiff prior to instituting suit. Defendants Does 1-50 are sued in their official and individual capacities for actions they personally committed.

26.    Whenever in this Complaint reference is made to any act of Defendants, such allegations shall be deemed to mean that all named Defendants and DOES 1-50 did such acts while acting under color of law. While acting as the agent, servant or employee of the ODRC, and while actively engaged in the operation, management, direction or control of the affairs of the ODRC and Defendant Mohr and while acting within the course and scope of their duties, except where alleged to the contrary.

27.    Plaintiff reserves the right to amed his Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to allege the Doe Defendants' true names and therein allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein

alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by their conduct.

28.     All Defendants are sued in their individual capacity and official capacity for actions he or she committed while acting under color of State law.

29.     At all times relevant to this Complaint, each individual defendant:

a.      acted under color of law, specifically under color of the statutes, ordinances, regulations, customs, and usages of the State of Ohio and the Ohio Department of Rehabilitation and Correction;

b.      was acting within the course and scope of his/her employment; and,

c.      engaged in the illegal conduct outlined below, causing injury to Plaintiff and depriving Plaintiff of his rights, privileges, and immunities under the <u>Eighth Amendment to the Constitution of the United States</u> and the laws of the United States and the State of Ohio.

30.     Plaintiff reserves paragraph 30 for amendments if and when needed after obtaining discovery, or otherwise.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

31. In 2011, Ohio Governor John R. Kasich appointed Defendant Mohr as Director of the Ohio Department of Rehabilitation and Correction (hereinafter "ODRC"). Governor Kasich directed Defendant Mohr to reduce the cost of prisoners' care. Thereafter, Governor Kasich reduced the amount of money available to the ODRC in the State's Budget.

32. Defendant Mohr negotiated a new contract between the ODRC and the Ohio State University Medical Center Hospitals (hereinafter "OSUMC").

33. Defendant Mohr's negotiated contract with the OSUMC, referred to in paragraph 32 above, prohibits the OSUMC physician, who examines an ODRC prisoner, from providing the medical care; such as necessary surgery, chemotheorapy treatments, pain medication, etc..., that the OSUMC physician has determined is necessary for the ODRC prisoner, unless the OSUMC physician has also determined that the ODRC prisoner is under an immediate, serious life threatening or disabling condition which would result in immediate serious physical impairment or loss of life if not treated immediately; otherwise, the OSUMC physician must send the ODRC prisoner away to return to prison without the necessary medical care and with only the OSUMC physician's recommendation that the ODRC prisoner be allowed to receive the medical care the OSUMC physician had determined is necessary.

34. Once an ODRC prisoner is sent away from the OSUMC and returned to the ODRC with the OSUMC examining physician's recommendations for medical care, such as necessary surgery, chemotheorapy treatments, pain medication, etc..., as described in paragraph 33 above, Defendant Mohr's ODRC Collegial Review Board (hereinafter "CRB") determines whether or not the prisoner is allowed to obtain the medical care deemed necessary and recommended by the OSUMC examining physician. Defendant Mohr's CRB members do not examine a prisoner

7

before denying the prisoner the recommended medical care.

35. In 2011, Defendant Mohr created the ODRC's Collegial Review Board (CRB) and appointed Defendant Eddy as the ODRC Medical Director and Director of the CRB to reduce the cost of prisoners' medical care.

36. Defendant Mohr created the Collegial Review Board (CRB) in a manner that requires the CRB to act in secrecy to avoid individual liability when denying an ODRC prisoner access to specialty health care, so there is no evidence of whether or not there was a CRB Review, no evidence of who participated in the CRB Review, if there was a CRB Review, and no evidence of a CRB Review decision in a prisoners medical file.

37. Collegial Review is a final decision that is rendered by central office staff and therefore is not appropriate for the grievance procedure.

38. The ODRC's CRB members are ODRC physicians and nurse practitioners whose job duties are to save the ODRC money on prisoners' medical care by denying prisoners access to specialty medical care beyond the expertise of the physicians at the ODRC prisoners' parent institution. Parent institution is the ODRC institution the prisoner is held or housed at.

39. From 2010 through 2013 Defendants Mohr, Eddy, Gardner and other Defendant Does 1-50 reduced ODRC prisoner medical care cost by 15% ($33.3 million). Nearly 90% of the savings ($30 million) came from the denial of specialty health care, surgical care and the like, that would have previously been provided almost exclusively by Ohio State University Medical Center Hospitals (OSUMC). The ODRC's cost savings on prisoners' health care continues through present date.

40. Beginning in 2011 through present date, Defendants Mohr, Eddy, Gardner, Krisher, Desmarias and Does 1-50, acting individually and collectively, created, implemented, approved and applied ODRC policies, regulations,

8

protocols, customs and usages that prohibit the ODRC Institution Chief Medical Officers and other physicians (doctors and nurse practitioners) who actually see and examine a prisoner's medical condition from requiring and ensuring that the prisoner be examined and treated by a qualified physician when the examining physician has determined that the prisoner's medical condition is beyond the scope of his or her medical qualifications and a medical specialist is needed. Said policies, regulations, protocols, customs and usages interfere with the examining physician's prescribed treatment plan and or duty to prescribe a treatment plan for the prisoner.

41. ODRC Policies are issued by the Director of the OHio Department of Rehabilitation and Correction under Ohio Revised Code 5120.01 and apply to all persons employed by or under contract with the Department of Rehabilitation and Correction and all offenders confined to institutions within the Department.

42. ODRC Medical protocol is an official guidance issued by the ODRC Medical Director to direct a medical procedure or course of action.

43. Formularies are lists of drugs approved for use by the ODRC Medical Director in treating certain illnesses and conditions. Drugs that do not appear on the formularies may not be prescribed unless approval is obtained from the ODRC Medical Director.

44. The treatment decisions of Institution Chief Medical Officers are limited by medical policies, protocols and formularies established by the ODRC Director and the ODRC Medical Director.

45. Defendant Mohr's Ohio Department of Rehabilitation and Correction (hereinafter "ODRC") Policy Number 68-MED-01 provides in the pertinent part:

a. The institution's Chief Medical Officer (CMO) is the Physician responsible for the day-to-day medical care of offenders at the institution level. The Chief Medical Officer is the ultimate medical authority at the institution.

9

I.d. at page 1, §IV;

b. An Advanced Level Provider (ALP) is a medical professional who is approved to practice as a Physician, an Advanced Practice Nurse under Ohio Revised Code section 4723.43, or a Physician's Assistant under Ohio Revised Code section 4730. Id. at page 1, §IV;

c. The Health Care Administrator (HCA) is the administrator responsible for the day-to-day operations of medical services at the institution level. The HCA is the health authority of the institution Id. at page 2, §IV;

d. The State Medical Director is the responsible physician and the medical authority for the Department. The State Medical Director is responsible for the overall planning, design, implementation, monitoring, utilization management, and evaluation of medical services provided within the Ohio Department of Rehabilitation and Correction. Id. at page 2, §IV;

e. A Medical Emergency is a serious life threatening or disabling condition(s) manifested by severe symptoms occurring suddenly and unexpectedly which would result in serious physical impairment or loss of life if not treated immediately. Id. at page 2, §IV;

f. The "Responsibilities of the Bureau of Medical Services (BOMS)" include, "the State Medical Director is responsible for the overall supervision of medical services." Id. at page 2, §VI (A)(1)(a);

g. Specialty Health Services are specialized health care beyond the resources available in the institution, as determined by the responsible physician. Id. at page 12, §VI(C)(1)(a),(b),(c),(d);

h. The Chief Medical Officer participates in the collegial review process, per Medical Protocol B-1, Consultation Referrals. Id. at page 4, §VI(A)(3)(b)(v);

i. The Chief Medical Officer determines whether an offender needs specialized health care that are beyond the scope provided by the medical department of

10

the parent institution. Id. at page 12, §VI(C)(1)(a), (d);

j. Department Medical Policy and Protocol are developed by the Bureau of Medical Services (BOMS), are reviewed and revised by the State Medical Director, are implemented in accordance with DRC guidelines by the HCA and the CMO, and the Managing Officer or designee are responsible for ensuring compliance with the policy or protocol. Id. at page 5, §VI(4)(a-f);

k. Offenders do not have the option to receive a second opinion in medical matters. Likewise, a "private physician" is not permitted to examine or treat an offender while incarcerated. Id. at page 16, §VI(F)(2)(a);

46. Ohio Revised Code §5120.21 and ODRC Policy 07-ORD-11 allows a prisoner to inspect, but not to posses, copies of his or her own medical records. In order to merely review his or her own medical records, a prisoner must complete a form and schedule an appointment. By contrast, an inmate's "designated attorney or physician" may obtain a physical copy of the records, upon an inmate's consent and payment of a "reasonable fee". O.R.C. §5120.21(C)(2). A request that an inmate's medical records be made available to a physician or to a designated attorney may not be made "more than once every twelve months".

47. Defendants Mohr, Eddy and Does 1-50's ODRC Protocol Number B-1 sets forth guidelines for specialty clinic referrals to CMC (currently FMC), Ohio State University Medical Center (OSUMC), and other specialty clinics, which must be followed before there can be a Collegial Review Process, and access to specialty health cure.

48. ODRC Protocol B-1, at section IV Directive, provides in the pertinent part:

a. (D) Specialty consultation referrals shall take place at the inmate's parent institution.

b. (E) The referring ALP shall write the order for the specialty

11

consultation and document the rationale for the referral in the Interdisciplinary Progress Notes (DMH0008). Consultation Request Forms (DRC5244) shall never be generated by nursing staff or consultant request without the institutional ALP's order and permission.

c. (F) Each referring ALP shall initiate, complete, and sign the Consultation Request Form (DRC5244) and will clearly and completely note:

d. (F)(3) Lab/X-ray Results: All appropriate x-rays, lab and diagnostic test results must accompany the consult. Consult the Office of Correctional Health Care (OCHC) Clinic Scheduling Guidelines for specific specialty clinic recommendations.

e. (G) Consults lacking full and complete information will be returned to the institution for completion before the appointment is scheduled. All of the previously outlined information is required.

f. (H) The institution Chief Medical Officer shall approve ll referrals for off-site medical specialty consultations, testing, or durable medical equipment prior to sending to the OCHC Central Scheduling office.

g. (J) The institution medical staff person responsible for medical scheduling at each institution shall update and track the Consult/Referral Flowsheet (DRC5535) each time an order for specialty consultation is received (electronic tracking is permissible as long as it contains all fields contained within the Consult/Referral Flowsheet, DRC 5535):

h. (L) Collegial Review Process for Institutions with Civil Service Medical Operations.

i. (L)(1) Each institution will have a scheduled day and time each week to review all generated consults from the previous week. The process will occur as follows:

j. (L)(1)(a) BOMS will initiate contact with the institution for the

12

Collegial Review process by contacting the institution at designated times/days. Institutions will be notified if these times/days vary from the routine prescheduled or prearranged schedule.

k.   (L)(1)(b) BOMS staff will email MOSS listings of pending consults for appointments and surgeries to the institutional Health Care Administrator (HCA) and CMO in preparation for the Collegial Review teleconference.

l.   (L)(1)(c) The CMO, HCA, Institutional Scheduler (HIT), and other ALPs as determined by the CMO, shall be present for the Collegial Review.

m.   (L)(1)(d) The HCA or designee shall have all consults and corresponding medical files prepared in advance for CMO review prior to the conference.

n.   (L)(1)(e) Each case will be presented and discussed individually.

o.   (L)(1)(f) Recommendations for alternative treatment or diagnostic plans shall be recorded in the respective charts and treatment or diagnostic plans adjusted.

p.   (L)(1)(h) All appropriate consults will be approved in MOSS by BOMS staff; all alternative treatment plan patients will be designated as Deny/APOC. Those consults requiring more information will remain pending until further review.

q.   (L)(1)(i) If, after an alternative treatment or diagnostic plan is implemented, the patient's condition warrants a second evaluation, the ALP may resubmit the case for collegial review.

r.   (L)(1)(j) Immediately following Collegial Review, the institution shall send all consults designated as approved status to OCHC Central Scheduling to be scheduled in MOSS.

s.   (N) Immediately upon return of the patient from a specialty consult appointment, the nurse will review all consultation froms, physician order sheets, and pertinent data relevant to the scheduled consultation.

t.   (O) All follow up consults shall be considered on a case-by-case basis

13

and are generated following procedures outlined in IV-A through N of this protocol.

49. Prisoners who have medical needs that cannot be met by Institution Chief Medical Officers are supposed to be referred to specialists at the Ohio State University Medical Center Hospitals (OSUMC).

50. Prisoners are totally dependent on the Defendants for the delivery of all of their medical care.

51. Prior to March 18, 2011, Defendants Mohr, Eddy, Gardner, Krisher, Desmarias and Does 1-50, acting individually and collectively, canceled all previously recommended and scheduled specialty health care appointments for ODRC prisoners who they determined, without examining the prisoner, did not have immediately life threatening medical conditions and ordered all ODRC CMOs and ALPs not to request or schedule any specialty health care appointments unless the CMO or ALP determine the prisoner's medical condition is a serious life threatening or disabling condition which would result in serious physical impairment or loss of life if not treated immediately.

52. Thereafter, Defendants Mohr, Eddy and Does 1-50, acting individually and collectively, threatened to and did terminate the ODRC employment relationship of the physicians, nurse practioners and nurses at CCI who continued to request specialty health care for prisoners who they had determined had medical needs beyond the scope of their medical qualifications.

53. As a result of the events stated in paragraphs 51 and 52 above, it became the policy, custom and usage of most CCI physicians, nurse practitioners and nurses to refuse to recommend or request specialty health care for a prisoner when they determined the prisoner's medical needs were beyond the scope of their medical qualifications unless they were convinced the prisoner was going to die immediately. ODRC Health Care Providers who were and are responsible for the health care of Plaintiff and other prisoners began and continue to

14

knowingly and purposely conceal the true nature of Plaintiff's and other prisoners' medical needs when they have determined Plaintiff and other prisoners needed specialty health care, so the responsible health care providers could and can avoid reprimand or termination of their employment by their superiors.

54. Defendants Mohr, Eddy, Gardner, Krisher, Desmarias and Does 1-50, acting individually and collectively, have knowingly and purposefully caused Plaintiff unnecessary pain, suffering and harm and endangered the lives and well-being of Plaintiff and many other ODRC prisoners by requiring Institution Chief Medical Officers to provide less efficacious treatment and medicine as a way to contain cost. As a result, institution doctors are making treatment decisions based not on the best interest of Plaintiff and other prisoners but on ODRC Central Office cost considerations.

55. On March 18, 2011, Defendant Houts informed Plaintiff that Defendants Mohr, Eddy, Gardner and Does 1-50 members of the CRB and Collegial Review Process, acting individually and collectively on March 16, 2011, had canceled Plaintiff's neurosurgeon consult that Defendant Houts had scheduled for Plaintiff on November 19, 2010.

56. After March 18, 2011, the CCI Doctors and Nurse Practitioners who refused to conceal the true nature of Plaintiff's and other Prisoners serious medical needs, to save the ODRC money on prisoners' health care cost, began disappearing from CCI. The disappearing Doctors and nurse practitioners were replaced by CCI doctors and Nurse Practitioners who did conceal the true nature of Plaintiff's and other prisoners' serious medical conditions to save the ODRC money on prisoners' health care cost and avoid reprimand or employment termination by Defendants Mohr, Eddy, Desmarias and Does 1-50.

57. As a result of the events set forth in paragraphs 31-56 above all

15

Defendants, acting individually and collectively, have knowingly and purposely caused Plaintiff and other prisoners unnecessary pain and physical harm, and even unnecessary death to some prisoners.

**FACTUAL ALLEGATIONS MOST COMMON TO PLAINTIFF"S BACK INJURY CAUSES OF ACTION**

58. From March 16, 2011, when Defendant Mohr and his CRB and Collegial Review Process canceled Plaintiff's previously scheduled neurosurgeon consult to save the ODRC money on prisoners health care cost, through November 23, 2016, when OSUMC Neurosurgeon James Elder performed surgery on Plaintiff's back, Plaintiff suffered unnecessary pain, irreparable harm and risk of more serious harm caused by all Defendants , except Defendant Free's, ongoing deliberate indifference to Plaintiff's serious, documented, painful degenerative disc disease back injury in violation of the cruel and unusual punishment proscribed by the Eighth and Fourteenth Amendments to the United States Constitution.

59. All Defendants, except Defendant Free, acting individually and collectively, knowingly and purposely caused Plaintiff to suffer pain, irreparable harm, and risk of more serious harm through their deliberate, persistent and ongoing failure to provide Plaintiff the necessary treatment and surgery required to treat Plaintiff's documented degenerative disc disease injury that caused Plaintiff to endure unnecessary severe back, leg and foot pain, leg numbness, irreparable drop foot, and partial paralysis of left leg and foot, so all said Defendants could save the ODRC money on prisoners health care cost and avoid reprimand or termination of their employment by Governor Kasich and Defendants Mohr, Eddy and Does 1-50.

60. On December 14, 2007, I, Plaintiff, was examined at CCI Nurses Sick (hereinafter "NSC") for a pinched nerve in my lower back that was causing me severe back and leg pain. The nurse informed me that she thought the problem

was a leg muscle. She did not schedule me to see a doctor. The leg pain dissipated, but the back pain continued.

61. On June 25, 2008, I was examined by CCI Dr. Cobb. Dr. Cobb prescribed Feldine prescription number (hereinafter "Rx") 681402, Ziks Arthritis Cream Rx 681403 and ordered an Xray of my lower back.

62. On July 02, 2008, a CCI Xray was taken of my lower back.

63. On August 18, 2008, I was examined by CCI Dr. Obregon. Dr. Obregon prescribed back pain medication, which I did not receive. On August 27, 2008 I filed an Informal Complaint regarding the back pain medication. On September 04, 2008, I received the back pain medication.

64. Thereafter, I was examined by: Defendant Houts on November 22, 2008, who prescribed Naprosyn for back pain; Dr. Obregon on January 15, 2009, and May 26, 2009, and an unknown CCI Doctor on September 17, 2009, for lower back pain, pinched nerve and other medical conditions.

65. On December 06, 2009, the pinched nerve in my lower back became worsen and caused me severe back, leg and foot pain, leg numbness, drop foot and a rise in my blood pressure caused by the pain. I had never had high blood pressure before.

66. On December 17, 2009, at CCI Doctors Sick Call (hereinafter "DSC"), I was examined by Defendant Houts for my back, leg and foot pain, leg numbness, drop foot and high blood pressure. Defendant Houts prescribed hydrochlorothiaside Rx 793736 for my high blood pressure, Indomethacin Rx 793737 and Flexirell for pain, and directed me to do stretches for my pinched nerve. I did as directed but the condition continued.

67. On January 14, 2010, at DSC, Defendant Houts ordered three weeks of blood pressure checks because my blood pressure was 146/99, placed me on Chronic Care Clinic (hereinafter "CCC") for high blood pressure and directed me to

continue stretching for nerve pain. I had already been on CCC for Hepatitis C and arm arthritis.

68. On January 25, 2010, at CCC, Defendant Houts prescribed Hydrochlorothiazide Rx800690 and Lisinopril Rx800691 for my high blood pressure that was caused by back, leg and foot pain.

69. On February 18, 2010, at DSC, Defendant Houts examined me for follow-up on my high blood pressure, and wrote prescription refills for Feldine, Ziks, Prilosec and Flonase.

70. On March 09, 2010 at NSC I was examined by a nurse for back pain and other conditions because my back, leg and foot pain continued and had gotten worse.

71. On April 05, 2010, at DSC, Defendant Houts prescribed me three (3) additional weeks of Flexirell and directed me to continue stretching. I did as directed, but the condition continued.

72. On May 14, 2010, at DSC, Defendant Houts ordered an EMG and a MRI to examine my severe, back, leg and foot pain, leg numbness and drop foot condition.

73. On July 21, 2010, I was taken on a round-trip to the ODRC's Correctional Medical Center (CMC), presently named the Franklin Medical Center (hereinafter "FMC"), and an EMG was performed. The FMC medical staff, who performed and reviewed the EMG, informed me that I do have a pinched nerve right where I said it was. A round-trip is when a prisoner is taken from his or her parent institution for specialty medical care and returned to the parent institution on the same day.

74. On August 04, 2010 at NSC, the nurse refilled my Ibuprophen and Ziks Arthritis cream prescriptions. The nurse informed me that I was scheduled for DSC for my EMG round-trip follow-up, and I will be scheduled for an MRI.

75. On or about September 08, 2010, at CCC, Defendant Houts canceled my 800mg

18

Ibuprophen prescription, because I have Hepatitis C. Thereafter, I asked Defendant Houts about the status of the MRI he had ordered for me on July 21, 2010, and I informed him that I was still having severe back, leg and foot pain. Defendant Houts informed me that ODRC Central Office Medical Departments failed to schedule the MRI. Defendant Houts informed me that he will re-order an MRI, and he prescribed Indomethecin for pain.

76. On November 01, 2010, I was taken on a round-trip to FMC for the MRI Defendant Houts had ordered on July 21, 2010 and re-ordered on September 08, 2010.

77. On November 03, 2010, I received the Indomethecin prescription that Defendant Houts had prescribed on September 08, 2010.

78. On November 19, 2010 at DSC Defendant Houts informed me that he had reviewed my July 21, 2010 EMG and my November 01, 2010 MRI results and he determined that my severe back, leg and foot pain, leg numbness and drop foot were caused by documented degenerative disc disease and a neurosurgeon was required for my condition. Defendant Houts informed me that he had scheduled me for a neurosurgeon consult for my painful degenerative disc disease condition.

79. However, on or about January 01, 2011, Defendant Mohr's ODRC Policy 68-MED-01 at section VI(A) (3)(b)(v) and Defendants Mohr, Eddy, Desmarias and Does 1-50's ODRC Protocols and ODRC Protocol B-1 interrupted Defendant Houts' prescribed treatment plan and prohibited Defendant Houts from requiring my degenerative disc disease back injury be examined by a qualified neurosurgeon as Defendant Houts had determined was necessary and had prescribed on November 19, 2010.

80. Defendants Mohr, Eddy, Desmarias and Does 1-50's ODRC Policies and Protocols stated in paragraph 79 above limited Defendant Houts to only recommending that Defendant Mohr's Collegial Review Board allow me to receive

19

the neurosurgeon consult Defendant Houts had prescribed and determined was required for my degenerative disc disease back injury.

81. On March 16, 2011, Defendant Mohr's Collegial Review Process was held regarding my degenerative disc disease condition and access to a neurosurgeon.

82. On March 16, 2011, Defendants Mohr, Eddy, Gardner, Desmarias and Does 1-50 who participated in Defendant Mohr's March 16, 2011 Collegial Review Process regarding my degenerative disc disease condition, acting individually and collectively, denied me access to the neurosurgeon consult Defendant Houts had prescribed after he determined, on November 19, 2010, was required for my serious medical condition. Said Defendants denied me access to the necessary neurosurgeon consult to save the ODRC and State of Ohio money on prisoners health care cost and to avoid reprimand from their superiors.

83. No member of Defendant Mohr's March 16, 2011 Collegial Review Process that denied me access to a qualified neurosurgeon was a neurosurgeon. No member of the March 16, 2011 Collegial Review Process ever examined me before denying me access to a neurosurgeon. No physician who ever examined my degenerative disc disease back condition had the authority to provide me access to the neurosurgeon required for my condition. No physician who ever examined my degenerative disc back condition was a neurosurgeon.

84. On March 18, 2011, Defendant Houts informed me that on March 16, 2011, Defendants Mohr, Eddy, Gardner and Does 1-50 other ODRC Central Office Medical Staff in Columbus, Ohio and members of the CRB and Collegial Review Process, acting individually and collectively, canceled the neurosurgeon consult Defendant Houts had scheduled for me on November 19, 2010.

85. On March 18, 2011, after the events stated in paragraph 84 above, I requested Defendant Houts to re-order a neurosurgeon consult for my back injury. Defendant Houts refused to do so. Defendant Houts informed me that the

ODRC's March 16, 2011, decision to deny me the neurosurgeon consult, Defendant Houts had scheduled for me on November 19, 2010, is a final decision rendered by Central Office Staff in Columbus, Ohio and he cannot override their decision or his ODRC employment will be terminated.

86. After the events stated in paragraphs 79-85 above, Defendants Mohr, Eddy, Desmarias and Does 1-50, acting individually and collectively, implemented and applied policies, protocols, regulations, customs and usages regarding ODRC and CCI DSC and CCC scheduling orders that prohibit Plaintiff's and other prisoners' medical conditions from continually being examined by a physician who has determined that Plaintiff's and other prisoners' medical needs require prescribed medication and or specialty health care, so the ODRC and its agents and employees can avoid liability when knowingly and purposely committing acts of negligence, medical malpractice, deliberate indifference and fraud regarding Plaintiff's and other prisoners' medical conditions and needs.

87. At least once every three (3) months from March 18, 2011 through November 23, 2016, I continued to complain to Defendants Houts, Rana, Artrip and Does 1-50, who examined me at Chronic Care Clinics and or Doctors Sick Call here at CCI, about my severe back, leg and foot pain, leg numbness and drop foot caused by my previously documented degenerative disc disease. All Defendants who examined me between March 18, 2011, and November 23, 2016, informed me that once Defendants Mohr and Eddy's Collegial Review Process had denied me a neurosurgeon consult on March 16, 2011 they could not override that decision or their employee relationship with the ODRC would be terminated by Defendants Mohr, Eddy and Does 1-50.

88. Ohio Administrative Code (OAC) 5120-9-31(B) and ODRC Administrative Regulation (AR) 5120-9-31(B) state: "The inmate grievance procedure will not serve as an additional or substitute appeal process for hearing officer

21

decisions, rules infraction board decisions or those issues or actions which already include an appeal mechanism beyond the institutional level or where a final decision has been rendered by central office staff."Id.

89. Defendant Free's Disposition of Grievance in my Grievance Number CCI-05-17-00061, regarding Defendants' ongoing deliberate indifference to my re-broken right arm humerus bone injury, quotes AR 5120-9-31 and states; "Collegial Review is a final decision that is rendered by central office staff and therefore is not appropriate for the grievance procedure.

90. Shortly after March 18, 2011, Defendant Houts and several other CCI doctors, nurse practitioners and nurses began complaining that Defendants Mohr, Eddy and Does 1-50's medical policies and protocols prohibit them from providing their patients the medical care they have determined their patient needs. In doing so, said policies and protocols require them to violate the oaths they had given to obtain their medical licenses. Defendant Houts and other complaining CCI health care professionals began disappearing from CCI.

91. On or about May 19, 2011, Defendants Mohr, Eddy and Does 1-50, acting individually and collectively, removed many approved prescription pain relief drugs and other drugs from the ODRC Drug Formulary, and sent Defendant Bottorff to CCI with instructions to cancel all prisoners' prior prescriptions that said Defendants had removed from the ODRC Drug Formulary by amendment.

92. On May 19, 2011 at DSC, Defendant Bottorff canceled my back pain, allergy and acid reflux prescriptions, i.e., Indomethacin Rx861127, Flonase Rx861126 and Priolesec Rx861125. Defendant Bottorff informed me that Defendants Mohr, Eddy and Does 1-50 had removed those drugs from the ODRC Drug Formulary and instructed her to cancel my prescriptions.

93. On May 19, 2011, I informed Defendant Bottorff that my degenerative disc disease back condition causes me severe back, leg and foot pain, drop foot and

22

leg numbness, and I requested her to send me to see a neurosurgeon for my painful condition, but she refused to do so. Defendant Bottorff informed me that once Defendants Mohr and Eddy's Collegial Review Process had denied me a neurosurgeon consult on March 16, 2011, she cannot override that decision or her ODRC employment will be terminated by Defendants' Mohr, Eddy and Does 1-50.

94. On May 17, 2012 at DSC for my ear infection, Dr. Carr prescribed ear drops and antibotics for my ear infection. I explained my degenerative disc disease condition to Dr. Carr. Dr. Carr attempted to address my painful degenerative disc disease back injury, but Defendant Does 1-50 interrupted my doctor sick call visit by walking in and stating "this doctor sick call visit is terminated, you must leave at once." Thereafter, Dr. Carr was removed from CCI by Defendants Mohr, Eddy and Does 1-50, acting individually and collectively.

95. On November 30, 2012 at CCC Nurse Practitioner (NP) Carolyn Galoro prescribed Mobic Rxl667049 for my degenerative disc disease back injury and said she will review my July 21, 2010 EMG and MRI results and perhaps get me approved for a neurosurgeon consult. Thereafter, NP Galloro was removed from CCI by Defendants Mohr, Eddy and Does 1-50, acting individually and collectively.

96. On December 12, 2012 at DSC, I was examined by Dr. Genevieve Bates who had already reviewed my medical file. Dr. Bates informed me that I need to see a neurosurgeon for my degenerative disc disease back injury, but if she recommends me for a neurosurgeon consult, Defendants Mohr, Eddy and Does 1-50 will just denny me access to the neurosurgeon to save the ODRC money on prisoners health care cost, so I will not get any relief.

97. On December 12, 2012 at DSC , Dr. Bates informed me that my painful

23

degenerative disc disease back injury qualifies me for a new arthritis medication called Methotrexate, and it will slow the progression of my degenerative disc disease, help reduce my pain and it will not be as harmful to my Hepatitis-C liver condition, as the drugs I had been taking.

98. On December 12, 2012 at DSC, Dr. Bates prescribed Methotrexate Rx1686826 and Folic Acid Rx1686828 for my degenerative disc disease back injury, and she gave me a shot for my back pain and a steroid shot for my inflamation in my back. She prescribed said medications with six (6) Months of refills.

99. On or about March 08, 2013, Dr. Bates' ODRC employment relationship was terminated by Defendants Mohr, Eddy and Does 1-50, acting individually and collectively. Said Defendants terminated Dr. Bates because Dr. Bates provided me and other prisoners the health care we needed and she refused to knowingly and purposefully conceal the true nature of our medical needs to save the ODRC money on prisoners health care cost. Based on information and belief, Defendants Mohr, Eddy and Does 1-50, acting individually and collectively, trumped up some other reason to terminate Dr. Bates' ODRC employment relationship.

100. On April 29, 2013 at DSC, Defendant Rana canceled the Methotrexate Rx1686826 and Folic Acid Rx1686828 prescriptions that Dr. Bates had prescribed on December 12, 2012. Defendant Rana prescribed Mobic Rx1891504 and Elavil for my degenerative disc disease back injury.

101. On April 29, 2013 at DSC, Defendant Rana refused my request that he order a neursurgeon consult for my degenerative disc disease condition. Defendant Rana informed me that since Defendants Mohr, Eddy and Does 1-50 had already denied me a neurosurgeon consult on March 16, 2011, Defendant Rana cannot override their decision and request a neurosurgeon consult or his ODRC employment will be terminated by said Defendants.

24

102. On October 21, 2013 at DSC, Defendant Rana prescribed ear drops for my ear infection. I informed Dr. Rana that the Mobic and Elavil he prescribed on April 29, 2013 for my degenerative disc disease back, leg and foot pain does not provide me any pain relief, the Elavil just knocks me out and slows my cognitive processes. I informed Dr. Rana that I cannot take the Elavil because the side effects make me dumbfounded. I asked Dr. Rana to prescribe me something else to control my intractable pain. Dr. Rana informed me that Mobic and Elavil are the only pain medications he can prescribe me due to ODRC policies and protocols. Dr. Rana informed me that he will schedule me to get a steroid shot for my degenerative disc disease that is causing severe back, leg and foot pain. I requested Dr. Rana to send me to see a neurosurgeon. Dr. Rana refused to send me to see a neurosurgeon. Dr. Rana did not schedule me for a steroid shot.

103. On November 11, 2013 at CCC, Dr. Sherry L. Russell gave me a steroid shot and prescribed Mobic Rx6175894 for my back, leg and foot pain. Dr. Russell informed me that since Defendants Mohr, Eddy and Does 1-50 Collegial Review Process had denied me a neurosurgeon consult on March 16, 2011 she cannot send me to see a neurosurgeon. Thereafter, Dr. Russell was removed from CCI by Defendants Mohr, Eddy and Does 1-50, acting individually and collectively.

104. On March 23, 2014, I sent a Health Care Request Slip for my severe back, leg and foot pain caused by degenerative disc disease that had gotten extremely worse on March 19, 2014.

105. On March 28, 2014 at DSC, NP Dove gave me a steroid shot for my degenerative disc disease pain and informed me that she will request my November 01, 2010 MRI results to review.

106. On April 04, 2014 at NSC for severe back, leg and foot pain caused by degenerative disc disease, the Nurse informed me that I will be scheduled for DSC.

107.    On April 08, 2014 at DSC, I informed Dr. Rana that my severe back, leg and foot pain caused by degenerative disc disease had become intractable. I informed Dr. Rana that my back, leg and foot pain is so intense that I could walk only thirty yards, while experiencing intractable pain, before I would have to drop to a squatting position to allow some relief from the burning pain I was experiencing.

108.    On April 08, 2014 at DSC after the events stated in paragraph 107 above, I requested Defendant Rana to send me to see a neurosurgeon for my degenerative disc disease that was causing me intractable back, leg and foot pain. Defendant Rana refused to send me to see a neurosurgeon. Defendant Rana informed me that he cannot override Defendants Mohr and Eddy's March 16, 2011 Collegial Review decision to deny me a neurosurgeon consult because, if he does so, Defendants Mohr and Eddy will terminate his ODRC employment.

109.    On April 08, 2014 at DSC after the events stated in paragraphs 107 and 108 above, Defendant Rana informed me that the best he can do is give me a steroid shot for my degenerative disc disease that was causing me intractable back, leg and foot pain. I informed Defendant Rana that the previous steroid shots I had been given did not give me any pain relief and do not work for my severe back, leg and foot pain. Defendant Rana informed me that the only other thing he can do is prescribe a predisolene steroid in a pill form as a carry medication, and he did so. However, I never received the prednisolene carry medication prescription Rx521923 because it was a controlled medication, but no one had informed me that it was not a carry medication,

110.    On April 13, 2014, I filed an Informal Complaint with Defendant Higginbotham regarding me not receiving the steroid medication Dr. Rana had prescribed on April 08, 2014.

111.    On April 14, 2014, I sent a Health Care Request Slip to get the April

26

08, 2014 prednisolone prescription referred to in paragraphs 109 and 110 above renewed.

112.  On April 16,2014 at NSC, the Nurse informed me that I will be scheduled to see a doctor to get the prednisolone prescription referred to in paragraphs 109-111 above renewed.

113.  On April 21, 2014 at DSC, Defendant Rana refused to re-prescribe the prednisolone in pill form as controlled medication. Dr. Rana gave me a Kinalog steroid injection and prescribed Elavil controlled medication for pain. I informed Dr. Rana that the previous steroid shots I had been given did not give me any pain relief. I informed Dr. Rana that the Elavil does not give me any pain relief and the Elavil dumbfounds me as described in paragraph 102 above. Defendant Rana refused to provide any alternative treatment.

114.  On April 25, 2014, I was either passed to go to, or called to go to the CCI Medical Records Department to see Nurse (Mrs.) Kearns. Nurse/Mrs. Kearns had me sign a medical records release form so my medical records could be released to Defendant Rana. I signed the medical records release form.

115.  On May 20, 2014 at CCC, Defendant Artrip renewed my Ziks Arthritis Cream and blood pressure prescriptions Rx6453477, Rx6453479 and Rx6453484. I informed Defendant Artrip about my intractable back, leg and foot pain caused by degenerative disc disease. I requested Defendant Artrip to send me to see a neurosurgeon for my degenerative disc disease back injury. Defendant Artrip informed me that since Defendants Mohr, Eddy and Does 1-50's Collegial Review Process had denied me a neurosurgeon consult on March 16, 2011, he cannot send me to see a neurosurgeon. Defendant Artrip informed me that Defendants Mohr and Eddy will terminate his ODRC employment if he attempts to override the March 16, 2011 Collegial Review decision.

116.  On May 20, 2014 at CCC, I informed Defendant Artrip that on April 25,

27

2014 I signed a medical record release form so Defendant Rana could review my MRI and EMG results from 2010. Defendant Artrip called Defendant Rana. Defendant Artrip informed me that Defendant Rana said he will review my MRI and EMG results and send me a pass for DSC.

117. On May 27, 2014 at DSC, I informed Defendant Rana that I am still experiencing intractable back, leg and foot pain caused by degenerative disc disease. I requested Defendant Rana to send me to see a neurosurgeon for my degenerative disc disease condition. Defendant Rana refused to send me to see a neurosurgeon. Defendant Rana informed me that he cannot override Defendants Mohr and Eddy's March 16, 2011 Collegial Review Process decision to deny me a neurosurgeon consult because, if he does so, Defendants Mohr and Eddy will terminate his ODRC employment.

118. On May 27, 2014 at DSC, I informed Defendant Rana that during the past winter, I slipped on ice going to lunch in the dining hall and I hit the ground really hard. I requested Defendant Rana to order an x-ray of my back to see if any bones were broken. Defendant Rana refused to order an x-ray. Defendant Rana prescribed prednisolene pills as controlled medication, take 40mg / 3 days and 20mg / 2 days. I took the prednisolene as directed, but my intractable back, leg and foot pain continued.

119. On August 25, 2014 at CCC, I informed Defendant Artrip that the prednisolene steroid medication Defendant Rana prescribed on May 27, 2014 did not help my intractable pain. I informed Defendant Artrip that I was having to take twelve (12) Ibuprophen, six (6) Tylenol and three (3) Naproxyn for pain everyday, just to be able to lay in bed, and I could not walk more than thirty (30) yards before I would have to drop to a squatting position to allow some relief from the burning pain I was experiencing.

28

120.     On August 25, 2014 at CCC, after the events stated in paragraph 119 above, I requested Defendant Artrip to send me to see a neurosurgeon for my degenerative disc disease that was causing intractable back, leg and foot pain. Defendant Artrip informed me that since Defendants Mohr and Eddy's Collegial Review had already denied me a neurosurgeon consult on March 16, 2011, he cannot request a neurosurgeon consult or his ODRC employment relationship will be terminated by Defendants Mohr, Eddy and Does 1-50. Defendant Artrip informed me that the only thing he can do is refill my Mobic and Elavil prescriptions which expired today, August 25, 2014. I informed Defendant Artrip that the Mobic and Elavil do not help my intractable back, leg and foot pain at all and the Elavil just knocks me out and dumbfounds me. Defendant Artrip said that is all I can do.

121.     On October 07, 2014 at CCC, NP Dove informed me that my blood pressure is 140/95 and my Hepatitis-C enzymes were elevated from 33 to 74. NP Dove prescribed Ziks Arthritis Cream Rx6656804 and informed me that if my blood pressure is not lower at my next CCC she will increase my Lisinopril prescription from 10mg to 20mg. I informed NP Dove that my Hep-C liver enzymes are probably elevated from me having to take Mobic, Naproxyn, Tylenol and Ibuprophen for my intractable pain caused by my degenerative disc disease injury, and my blood pressure is probably rising because of the intractable pain I am experiencing. I asked NP Dove if she can get me approved for a neurosurgeon consult. NP Dove informed me that since Defendants Mohr and Eddy's Collegial Review Process had already denied me a neurosurgeon consult on March 16, 2011, she cannot schedule me to see a neurosurgeon.

122.     On December 09, 2014 at CCC, I continued to complain about my intractable back, leg and foot pain caused by degenerative disc disease to Defendant Artrip, and I requested him to send me for a neurosurgeon consult

because the pain medication I had been prescribed did not relieve my intractable pain at all. Defendant Artrip refused to send me to see a neurosurgeon. Defendant Artrip informed me that all he can do is increase my Mobic prescription to 15mg and renew my Elavil prescription, and he did so.

123.  On June 09, 2015 at CCC, I complained to Defendant Rana about my re-broken right arm humerus bone pain and about my intractable back, leg and foot pain caused by degenerative disc disease. I informed Defendant Rana that the Mobic and Elavil that I had previously been prescribed for my back, leg and foot pain do not provide me any pain relief at all. I requested Defendant Rana to send me to a neurosurgeon. Defendant Rana informed me that once Defendants Mohr and Eddy's Collegial Review Process had denied me a neurosurgeon consult on March 16, 2011, he cannot override that decision or his ODRC employment will be terminated by Defendants Mohr, Eddy and Does 1-50. Defendant Rana did order an x-ray of my re-broken right arm.

124.  On July 07, 2015 at DSC, I complained to Defendant Rana about my re-broken right arm humerus bone pain and my intractable back, leg and foot pain caused by degenerative disc disease. Defendant Rana informed me that since Defendants Mohr and Eddy's July 02, 2015 Collegial Review Process, regarding my re-broken right arm humerus bone and their March 16, 2011 Collegial Review Process, regarding my degenerative disc disease had denied me the orthopedic consult for my re-broken right arm humerus bone and elbow replacement and had denied me a neurosurgeon consult for my degenerative disc disease, he cannot override their Collegial Review Processes because, if he does so, Defendants Mohr, Eddy and Does 1-50 will terminate his ODRC employment.

125.  On July 09, 2015, August 17, 2015, September 14, 2015 and October 06, 2015 at DSC, and on May 25, 2016 at CCC, I continued to complain to Defendant Artrip that my severe back, leg and foot pain caused by degenerative disc

30

disease is intractable, and the Mobic, Elavil and Tegratol that I have previously been prescribed do not provide me any pain relief at all. I continued to request Defendant Artrip to prescribe me some type of pain medication that will relieve my pain. Defendant Artrip informed me that Defendants Mohr and Eddy's policies and protocols will not allow him to prescribe any other pain medication besides Mobic, Elavil and Tegratol.

126.    On July 09, 2015, August 17, 2015, September 14, 2015 and October 06, 2015 at DSC, and on May 25, 2016 at CCC, after the events stated in paragraph 125 above, I continued to request Defendant Artrip to send me to a neurosurgeon for my degenerative disc disease back injury that caused intractable back, leg and foot pain. Defendant Artrip continued to inform me that since Defendants Mohr, Eddy and Does 1-50's March 16, 2011 Collegial Review Process had denied me a neurosurgeon consult, he cannot override that decision or his ODRC employment will be terminated by Defendants Mohr, eddy and Does 1-50.

127.    On May 25, 2016 at CCC, after the events stated in paragraphs 125 and 126 above, Defendant Artrip informed me that the only other thing he can do for my intractable back, leg and foot pain caused by degenerative disc disease is to send me a pass for mandatory exercises with the nurse, and he did so.

128.    On May 27, 2016, I went to the infirmary and did mandatory exercises with a nurse.

129.    On June 15, 2016 I had a pass for CCC to see Defendant Artrip; however my CCC appointment was canceled because Defendant Artrip did not work that day.

130.    On June 16, 2016 at CCC, NP Dove informed me she had to cancel my Mobic prescription because Defendants Mohr, Eddy and Does 1-50 had taken Mobic off the approved ODRC Drug Formulary. I informed NP Dove that I am still

31

experiencing intractable back, leg and foot pain caused by degenerative disc disease, and I requested NP Dove to send me for a neurosurgeon consult. NP Dove informed me that she cannot schedule a neurosurgeon consult since Defendants Mohr, Eddy and Does 1-50's March 16, 2011 Collegial Review Process had denied me a neurosurgeon consult. Thereafter, NP Dove increased my Tegretol from 100mg to 200mg and ordered a new back x-ray to examine my degenerative disc disease injury.

131.    On June 17, 2016 at CCI an x-ray was taken of my lower back by a new x-ray technician. The x-ray showed I had a bulging disc and the vertebrae above and below the bulging disc were almost rubbing together.

132.    On June 28, 2016 at DSC, NP Dove reviewed my June 17, 2016 back x-ray and informed me that she will review my 2010 EMG and MRI results, and then determine whether to order a new EMG and MRI. I informed NP Dove that I cannot continue to take the Tegeretol for my degenerative disc disease back pain because, just like the Elavil, it does not provide me any pain relief and it slows my cognitive processes.

133.    On or about August 02, 2016, I had an MRI at FMC.

134.    On or about August 17, 2016, I had an EMG at FMC.

135.    On August 18, 2016 at CCC, NP Dove informed that I will be scheduled for a Telemedicine consult with a neurosurgeon.

136.    On October 03, 2016, I had a Telemedicine (hereinafter "Telemed") video consult, under ODRC Plicy Number 68-MED-14(VI)(E)(3)(a), with OSUMC Neurosurgeon James B. Elder, MD. (hereinafter "Dr. Elder"). Dr. Elder informed me that he had reviewed my MRI and EMG results and recommends surgery and he will schedule me for a personal examination to discuss surgery and MRI and EMG results. Dr. Elder informed me that he will recommend that CCI give me pain medication for the round-trip from CCI to OSUMC and will determine additional

32

pain medication depending on whether we decide to do surgery or not.

137.    On October 06, 2016 at DSC, NP Dove consulted me for follow-up regarding the October 03, 2016 OSUMC Neurosurgeon Dr. Elder Telemed video consult.

138.    On October 26, 2016, I saw CCI scheduler, Debbie Tinsley, to sign an AMA to go to OSUMC for a neurosurgeon consult. Mrs. Tinsley called NP Dove. NP Dove contacted CCI Dr. Ventosa to get the round-trip pain medication Dr. Elder had recommended approved. Thereafter, the second shift CCI nurse called me to the Infirmary to pick up my pass to come to the CCI Infirmary at 5:30 A.M. on October 27, 2016 to take round-trip pain medication (two Tylenol Three's).

139.    On October 27, 2016, I was given two Tylenol Three's at CCI 5:30 A.M. controlled meds and taken to the OSUMC to see OSUMC Neurosurgeon Dr. Elder.

140.    On October 27, 2016 at OSUMC Neurosurgeon examination by Dr. Elder, Dr. Eder informed me that my intractable back, leg and foot pain is from spinal stenosis. Dr. Elder showed me the August 02, 2016 MRI images. Dr. Elder showed me where on the MRI Images and informed me that arthritis has swollen my spinal column canal around and into the spinal nerve in at least three (3) places between different vertebrae, and this is what is causing me to suffer so much pain. Dr. Elder explained that the spinal fluid that protects the spinal nerve from the bones of the spinal column has been pushed away and there is no longer any spinal fluid present to protect the spinal nerve from the bones of the the spinal column between those same three (3) vertebrae. Dr. Elder was amazed that I could even walk. Dr. Elder informed me that my spinal column could deaden my spinal nerve in as little as two (2) days or two (2) weeks , and he suggested I allow him to perform surgery if he can get ODRC to approve the surgery. I agreed, I want and need the surgery because my pain has been unbearable for several years. Dr. Elder recommended I be prescribed Hydro-codone for pain.

33

141.    On October 28, 2016, Defendant Artrip refused to prescribe the Hydro-codone recommended by OSUMC Neurosurgeon Dr. Elder the day before. Defendant Artrip prescribed one (1) 50mg Altrim at 8:00 A.M. and one (1) 50mg Altrim at 7:50 P.M. and said that is the maximum pain medication Defendants Mohr and Eddy's ODRC Policies and Protocols will allow him to prescribe. The one (1) 50mg Altrim twice a day did not provide me any pain relief for my spinal stenosis condition caused by degenerative disc disease. I continued to suffer intractable pain.

142.    On November 23, 2016 at the OSUMC, OSUMC Neurosurgeon Dr. Elder performed a laminectomy on three (3) of my lower back vertebrae to give access to my spinal cord and relieve the pressure on my spinal cord and nerves, so that my spinal column does not squeeze and deaden my spinal nerve and cause me to suffer total paralysis from the waist down.

143.    Because of the more than five-year delay by Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham and Does 1-50, acting individually and collectively, in providing adequate treatment to Plaintiff for my serious degenerative disc disease back injury, Plaintiff suffers ongoing health problems that include but are not limited to irreversible nerve damage that causes pain, drop foot, partial leg numbness and partial leg and foot paralysis.

144.    Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Higginbotham and Does 1-50, acting individually and collectively, created and participated in the ODRC's March 16, 2011 Collegial Review Process to deny Plaintiff access to a neurosurgeon consult for my degenerative disc disease back injury to save the ODRC money on prisoners' health care cost and avoid reprimand or employment termination by their supervisors.

145.    Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham and Does 1-50, acting individually and

34

collectively, knowing and purposely acted with abduracy and wantonness to unnecessarily and intentionally inflict unnecessary pain, irreversible harm and risk of more serious harm upon Plaintiff when said Defendants knowingly and purposefully delayed adequate treatment to Plaintiff for my documented degenerative disc disease back injury from March 16, 2011 to November 23, 2016.

146. The medical assistance administered by Defendants, Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham, and Does 1-50, acting individually and collectively, to Plaintiff for Plaintiff's degenerative disc disease back injury was so woefully inadequate as to amount to no treatment at all form March 16, 2011 to November 23, 2016 when surgery was performed on Plaintiff's lower back by OSUMC Neurosurgeon Dr. Elder.

147. Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham and Does 1-50, acting individually and collectively, have acted with deliberate indifference to Plaintiff's serious medical needs regarding Plaintiff's degenerative disc disease back injury.

148. As a result of the deliberate indifference of Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham and Does 1-50, acting individually and collectively, to Plaintiff for Plaintiff's degenerative disc disease back injury, Plaintiff has suffered pain and emotional distress and a marked deterioration of Plaintiff's overall health.

149. Defendants Mohr, Eddy, Gardner, Krisher, Desmarias, Rana, Artrip, Houts, Bottorff, Higginbotham and Does 1-50, acting individually and collectively, have acted with malicious purpose, in bad faith and or in a wanton and reckless manner regarding Plaintiff's degenerative disc disease back injury.

150.    Defendants Mohr, Eddy, Gardner, Bottorff, Krisher, Desmarias, Rana, Artrip, Houts, Higginbotham and Does 1-50 have acted with deliberate indifference to plaintiff's degenerative disc disease back injury. Said Defendants, referred to in this paragraph, have permitted the said deprivations, participated in said deprivations, or knowingly acquiesced to said deprivations of Plaintiff's rights.

151.    Defendants Mohr, Eddy, Gardner, Bottorff, Krisher, Desmarias, Rana, Artrip, Houts, Higginbotham, and Does 1-50 have conspired to act with deliberate indifference to Plaintiff's known and recognized serious medical needs regarding Plaintiff's degenerative disc disease back injury.

152.    As a result of Defendants Mohr, Eddy, Gardner, Bottorff, Krisher, Desmarias, Rana, Artrip, Houts, Higginbotham, and Does 1-50's actions and inactions described above, Plaintiff has suffered and continues to suffer deprivations of basic constitutional rights.

153.    Plaintiff has suffered and is suffering irreparable harm for which he has no adequate remedy at law.

154.    Plaintiff has suffered serious and substantial physical and emotional injury, pain and suffering, and other injuries and damages.

155.    All Defendants, acting individually and collectively, made a conscious decision to deny

Plaintiff medical care free from the cruel and unusual punishment proscribed by the Eighth

Amendment to the U.S. Constitution when all Defendants, acting individually and collectively,

created, implemented, approved and applied the ODRC policies, regulations, protocols,

contracts, customs and usages, referred to in this Complaint,:

a.      that prohibited the doctors and nurse practitioners (hereinafter "physicians") who actually

saw and examined Plaintiff's painful, serious, medical conditions, described in this Complaint,

from requiring and ensuring that Plaintiff be examined and treated by a qualified physician;

I.      when Plaintiff had already complained about his painful, serious, medical conditions,

described in this Complaint, to the examining physicians, and,

II.     the examining physicians had already determined that Plaintiff's painful, serious, medical

conditions, described in this Complaint, are beyond the scope of the examining physicians

medical qualifications and a medical specialist is needed;

b.      when, after the examining physicians had already determined Plaintiff's painful serious

medical conditions, described in this Complaint, were beyond the scope of the examining

physicians' medical qualifications and a medical specialist was needed to diagnose and treat

Plaintiff's painful serious medical conditions, said ODRC policies, protocols, contracts, customs

and usages required the decision, whether or not to provide Plaintiff access to an examination by

a medical specialist physician having the medical qualifications required to diagnose and treat

Plaintiff's painful serious medical conditions, to be made by ODRC physicians and other ODRC

agents who:

37

I.      did not examine the Plaintiff's painful, serious, medical conditions, described in this

Complaint, before making the decision to deny Plaintiff access to the required medical specialist

physician and/or;

II.     were/are acting beyond the scope of their medical qualifications when making the

decision to deny Plaintiff access to the required medical specialist physician.

c.      that interfered with the examining physicians prescribed treatment plan.

156.    The ODRC Collegial Review process is a specter of an ODRC medical review, process,

or procedure that was conjured up by all Defendants, acting individually and collectively,:

a.      that does and did not occur regarding Plaintiff's painful, serious, medical conditions,

described in this Complaint, and/or,

b.      to provide Defendants a way to avoid liability for their acts and omissions, alleged in this

Complaint,. that caused Plaintiff to suffer unnecessary pain, deterioration of overall health and

risk of farther future harm resulting from the inadequate medical care all Defendants provided to

Plaintiff in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

157.    Plaintiff alleges that the facts stated in paragraph 156(a) above is the reason there is no

evidence of a Collegial Review Process occurring, regarding Plaintiff's painful, serious, medical

conditions, described in this Complaint.

158.    As a result of the known, purposely committed, unconstitutional, wrongful, unlawful and

willful acts and/or omissions of Defendants, as alleged in this Complaint, Plaintiff has suffered

intractable, excruciating pain and deterioration of overall health entitling Plaintiff to damages in

an amount to be proven at trial.

159.   Plaintiff has exhausted his administrative remedies. Proof of exhaustion is attached hereto as Exhibits A, B, C, D, E, F and G.

160.   Plaintiff reserves paragraphs 160 through 200 for amendments if and when needed after obtaining discovery, or otherwise.

**FACTUAL ALLEGATIONS MOST COMMON TO PLAINTIFF'S RE-BROKEN RIGHT ARM INJURY CAUSES OF ACTION**

201. Beginning on April 29, 2013 and from July 2013 when Plaintiff re-broke his right arm Humerus bone, through April 19, 2017 when Defendant Awan performed artificial elbow implant surgery on Plaintiff's right arm to repair Plaintiff's re-broken and completely re-severed right arm Humerus bone, Plaintiff suffered unnecessary pain, emotional distress, risk of serious harm, and deterioration of right arm and overall health caused by all Defendants except, Defendants Houts and Bottorff's, ongoing deliberate indifference to Plaintiff's serious documented, painful, re-broken and completely re-severed right arm Humerus bone injury in violation of the cruel and unusual punishment proscribed by the Eighth and Fourteenth Amendments to the United States Constitution.

202. All Defendants, except Defendants Houts and Bottorff, acting individually and collectively, knowingly and purposefully caused Plaintiff to suffer unnecessary pain, emotional distress, risk of serious harm and deterioration of Plaintiff's right arm and overall health through their deliberate, persistent and ongoing failure to provide Plaintiff the necessary treatment and surgery required to treat Plaintiff's documented, painful re-broken and completely re-severed right arm Humerus bone injury, so all Defendants could save the ODRC money on prisoners' health care cost and avoid reprimand or termination of their employment by Governor Kasich and Defendants Mohr, Eddy, Desmarias and Does 1-50 acting individually and collectively.

203. All Defendants, except Defendants Houts and Bottorff, acting individually and collectively, knowingly and purposely acted with abduracy and wantonness to unnecessarily and intentionally inflict unnecessary pain, emotional distress and risk of serious harm upon Plaintiff when they knowingly

40

and purposely concealed, and or conspired to conceal, the fact that the xray image of one (1) of the four (4) June 26, 2015 OSUMC xrays of Plaintiff's right arm shows a screw from a previous surgery has broken through Plaintiff's right arm Humerus bone and Plaintiff's right arm Humerus bone is completely severed from the bones and screws of Plaintiff's lower right arm at the elbow area, as is more fully described at paragraph 223 below, and the June 26, 2015 OSUMC examining physicians requested that Plaintiff be scheduled for an appointment as soon as possible for a visit with the Hand Clinic at the Franklin Medical Center (FMC) for consultation and treatment of the Humerus fracture of Plaintiff's right elbow surgical repair.

204.  On December 2, 1981, I, Plaintiff, had a motorcycle accident which broke my right elbow joint. The orthopedic surgeon put three screws through the bones, to act as a hinge or an elbow joint, to connect the upper right arm Humerus bone to the bones of the lower arm at the elbow area.

205.  On April 24, 2013, I was screened at Chillicothe Correctional Institution (CCI) Nurses Sick Call (NSC) for my complaints that I had pain and a possible pulled tendon or a broken bone or screw in my right arm elbow area because I felt a slipping of bones and pain in my right elbow that I had never experienced before. I was scheduled for my April 29,2013 CCI Doctors Sick Call (DSC).

206.  Plaintiff fully incorporates herein by reference paragraphs 204 and 205 of this Complaint.

On April 29, 2013, at CCI Doctors Sick Call (DSC), I described my 1981 right arm injury as set forth in paragraph 204 and 205 above to Defendant  Dr. Rana. My right arm injury was examined by Dr. Rana for my Complaints that I had pain and a possible pulled tendon or broken bone or screw in my right arm elbow area because I felt a slipping of bones and pain in my right elbow that I had

41

never experienced before. Dr. Rana refused to order xrays of my right arm, and refused to send me to see an orthopedic doctor for my injury. Dr. Rana said, Director Mohr, Dr. Eddy and the Collegial Review Board (CRB) do not allow me to request additional medical care unless you are under immediate threat of death and you do not look like you are dying, they will take my job if I request outside care," i.e. care outside CCI.

207.     Just before July 18, 2013 at the CCI North Field, I threw a soft ball and felt extreme pain like a bone or screw had broken in my right arm and I could see the right arm Humerus bone was protruding forward toward the wrist side of arm and the Humerus bone never protruded like that before. The injury and the need for medical treatment and surgery was obvious even to a layperson. The pain continued. I submitted a Health Care Request Form (HCRF).

208.     Plaintiff fully incorporates herein by reference paragraphs 204 through 207 of this Complaint.

On July 18, 2013, I was screened at CCI Nurses Sick Call (NSC) where I complained of right arm pain and described my right arm pain and injury as set forth in paragraphs 204-207  above. The Nurse examined my right arm and told me I would be scheduled for DSC in 7 to 10 days to get a doctor to order xrays. I never got DSC follow-up.

209.     Plaintifff fully incorporates herein by reference paragraphs 204 through 208 of this Complaint.

On August 05, 2013 at CCI Chronic Care Clinic (CCC) for Hepatitis C (Hep-C), I described my right arm pain and injury as set forth in paragraphs 204-208 above to CCI Dr. Aktar. Dr. Aktar examined my right arm Humerus bone protruding forward and immediately sent me to the CCI X-Ray Department to have my right arm xrayed. Dr. Aktar told me he will have me scheduled for DSC follow- up after the Radiology Report comes back. I never got DSC follow-up.

42

210.    On August 05, 2013, the CCI xray technician took only two (2) xrays
(two angles) of my right arm. The xray technician and I watched the xrays
develop and appear onto the computer screen and only two views of the xrays
appeared. I requested the xray technician to take more xrays, four (4) views,
in different angles around my right arm, as was done by my pevious xray
technicians and orthopedic doctors. The xray technician denied my request for
additional xrays and stated, "Director Mohr, Dr. Eddy and the Collegial Review
Board will see I am fired from my job if I take more xrays than they have
approved." I never got follow-up.

211.    On August 05, 2013, the CCI xray technician had me straighten my right
arm out the best I could, with wrist side up, and then roll my arm to the
right, with wrist side right and ulna bone and Epicondyles up before taking
the xray. When I put my arm in said position, the separated humerus bone moved
back underneath the epicondyles and the Humerus bone does not protude forward,
i.e., you can no longer see the Humerus bone protruding forward with the naked
eye, and you can no longer feel the Humerus bone with the hand, the Humerus
bone disappears. The aforesaid position is the reason the August 05, 2013 CCI
xrays do not show the screw has broken through the right arm humerus bone.

212.    On October 14, 2013, I submitted a Health Care Request Form (HCRF) for
an ear infection and right arm injury.

213.    On October 16, 2013, I was screened at CCI NSC for my complaints of ear
infection and not getting DSC follow-up for my right arm pain and injury that
Dr. Aktar had ordered on August 5, 2013. The Nurse said, Dr. Aktar did
schedule you to come back to see him in 30-days, but you were not scheduled.
I'm scheduling you for Dr. Sick Call for your ear and right arm xray doctor
sick call follow-up.

214.    Plaintiff fully incorporates herein by reference paragraphs 204 through

213 of this Complaint.

On October 21, 2013, at CCI Doctors Sick Call (DSC) for an ear infection and right arm elbow pain, injury and xray follow-up, I described my right arm pain and injury as set forth in paragraphs 204-208 above to Dr. Rana. Dr. Rana examined my right arm Humerus bone protruding forward, reviewed the August 5, 2013 CCI xrays and corresponding Franklin Medical Center (FMC) Radiology Report on his computer, and showed me the August 5, 2013 CCI xrays (only two views) on his computer. Dr. Rana told me that the Radiology Report says, "all hardware in tact and no broken bones"; then, Dr. Rana said, "the pain is probably from a torn tendon or muscle, try to workout real light and let it heal and strengthen up slowly."

215. On October 21, 2013, after the events stated in paragraph 214 above, I pointed out to and told Dr. Rana that the August 05, 2013 CCI xrays we were reviewing show one screw laying across the other two screws, the heads of the screws were not depicted in the xrays and we cannot see if a screw or bone has broken due to the mass of bone at the elbow area. I requested Dr. Rana to order more x-rays, four views, at different angles around my right arm, as my previous xray technicians and orthopedic doctors had done, but Dr. Rana refused to do so. I requested Dr. Rana to send me to see an orthopedic doctor. Dr. Rana said, "Director Mohr, Dr. Eddy and the Collegial Review Board do not allow me to request additional medical care unless you are under immediate threat of death and you do not look like you are dying, they will take my job if I request outside care."

216. Plaintiff fully incorporates herein by reference paragraphs 204 through 215 of this Complaint.

At CCI Cronic Care Clinic and or Doctors Sick Call approximately every three months after October 21, 2013 through June 23, 2015, I continued to describe my right arm pain, injury and problem as set forth in paragraphs 204-215 above

44

and complain about extreme right arm pain and obvious injury, and I showed each Doctor or Nurse Practitioner my severed right arm humerus bone protrudes forward to: Defendant Rana on February 10, 2014, April[''] 08, 2014, April 21, 2014, May 27, 2014, November 19, 2014, June 09, 2015 and June 23, 2015; Defendant Artrip on August 25, 2014, NP Ventosa on March 09, 2015; and all other Defendant Does 1-50 who were CCI Doctors and Nurse Practioners that I saw at CCI Doctors Sick Call or Cronic Care Clinic from October 21, 2013 through June 23, 2015. I requested all CCI doctors and nurse practioners named or referred to as Doe Defendants in this paragraph to order more xrays or send me to an orthopedic doctor, but all those individuals refused to do so, telling me that:"The Radiology Report says all hardware in tact and no broken bones. Director Mohr, Dr. Eddy and the rest of the Collegial Review Board will not allow us to order additional or outside treatment unless the inmate is in immediate danger of death."

217.   On June 09, 2015, after my continued insistence, Defendant Rana finally ordered another xray of my right arm elbow area.

218.   On June 11, 2015 the CCI xray technician, who took the August 05, 2013 CCI xrays, again, took xrays of my right elbow.

219.   On June 23, 2015 at CCI DSC, Dr. Rana reviewed the June 11, 2015 xrays on the computer and said, "there are still no broken bones and all hardware is still in tact, but I am going to request Dr. Eddy in Columbus to approve you for an orthopedic consult"

220.   Plaintiff fully incorporates herein by reference paragraphs 204 through 219 of this Complaint.

On June 25, 2015, I went to the Chillicothe Correctional Institution (CCI) Infirmary because my right elbow was red and appeared to be getting infected. There were no doctors at CCI. I described my right arm pain and injury as set forth in paragraphs 204-215 above to the CCI Infirmary Nurse. The CCI

45

Infirmary nurse informed me that she called Defendant Dr. Andrew Eddy, ODRC's Chief

Medical Officer & Director of the ODRC's Collegial Review Board, in Columbus, Ohio. A CCI

Lieutenant came to the Infirmary with a cell phone to take pictures of my obviously broken right

arm Humerus Bone protruding forward on wrist side of arm. The Lieutenant informed me that

Defendant Eddy sent her to take a picture of my right arm with cell phone. The Lieutenant took

pictures of my right arm and informed me she was going to send Defendant Eddy a copy of the

pictures. Later, the CCI Nurse gave me one antibiotic and released me from the CCI Infirmary.

221.    On June 26, 2015, there were no doctors scheduled to work at CCI, and Defendant Eddy

ordered the Chillicothe Correctional Institution (CCI) staff to take me to the Ohio State

University Medical Center (OSUMC) Emergency Room (ER) to have my right elbow examined.

222.    On June 26, 2015, I appeared at the Ohio State University Wexner Medical Center

(OSUMC) ER where I complained of right arm elbow pain, and right arm Humerus bone

protruding forward on wrist side of arm. The OSUMC ER took four (4) xrays, at different

angles, of my right elbow, Medical Record Number (MRN) 970351517.

223.    On June 26, 2015, xrays at the Ohio State University Wexner Medical Center (OSUMC)

reveal that:

(a) during a previous surgery my upper right arm Humerus bone had been cut off flat at the

elbow area somewhere around the Trochlea or Epicondyles, the elbow joint is gone, and three

screws were screwed through the bones, to act as a hinge or an elbow joint, to connect the

Humerus bone to the bones of the lower arm at the elbow area;

(b) presently, my right arm Humerus bone is re-fractured, completely broken in half at the elbow

area and only muscles, tendons, and nerves attach the Humerus bone (upper arm) to the elbow

area or lower arm;

(c) the screw that had been screwed through the upper arm Humerus bone and into the bones of the lower arm at the elbow area during the previous surgery, to attach the Humerus bone to the bones of the lower arm, has broken through the Humerus bone and the Humerus bone is completely disconnected (severed) from the bones and screws of the lower arm. The screw that has broken through the Humerus bone is attached to the bones of the lower arm on one end and the other end of the screw is protruding out from the bones of the lower arm at the elbow area approximately three-fourths of an inch (3/4"), and there has to be a bone fragment inside my arm that the screw broke off the Humerus bone. The xray shows the half screw hole through the Humerus bone where the screw broke through the Humerus bone and came loose on that end. See Skeletal System 61 diagram Exhibit Z attached hereto.

224. Based on Plaintiff's personal knowledge information and belief, on June 26, 2015, at the Ohio State University Wexner Medical Center (herein after "OSUMC") Emergency Room (herein after "ER"), I was examined by OSUMC doctors Defendant Edward A. Michelson, MD; Defendant Craig B. Key, MD; Defendant Andrew J. Krieger, MD; Defendant Robert C. Ryu, MD; Defendant Joseph S. Yu, MD; and other Defendants Does 1-50 OSUMC doctors, nurses and interns (herein after "OSUMC Defendants").

225. On June 26, 2015, at the OSUMC ER, the following events took place:

a. I informed all OSUMC Defendants who examined me in the OSUMC ER that I have right arm elbow pain, showed said Defendants that my right arm Humerus bone was protruding on the wrist side of arm, and the right arm moves at the elbow area in ways an arm and elbow are not suppose to move.

b. All OSUMC Defendants who examined me reviewed, with me, the June 26, 2015, OSUMC xray images described in paragraph 223(a-c) above.

c. All OSUMC Defendants who examined me, acting individually and collectively, asked me if I could inform them how and when I originally broke my right arm and had surgery that put the three (3) screws through the bones to connect the bones of the lower right arm to the Humerus bone of the upper right arm at the elbow area.

d. I informed all OSUMC Defendants who examined me that on December 02, 1981 I had a motorcycle accident that shattered my right elbow joint and completely severed the bones of the lower arm from the bones of the upper arm at the elbow area, and the orthopedic surgeon put three (3) screws through the bones, to act as a hinge or an elbow joint, to connect the upper right arm Humerus bone to the bones of the lower arm at the elbow area.

e. All OSUMC Defendants who examined me, acting individually and collectively, asked if I knew how and when I re-broke my right arm Humerus bone causing the screw that had been put through the upper right arm humerus bone to break through the Humerus bone leaving the Humerus bone completely re-severed from the bones and screws of the lower arm at the elbow area.

f. I informed all OSUMC Defendants who examined me that in July 2013 at CCI the following events took place:

(I) I threw a softball at CCI and I felt extreme pain in my right arm that felt like a bone or screw had broken in my right arm;

(II) I could see the upper arm Humerus bone protruding toward the wrist side of right arm and the Humerus bone had never protruded like that before;

(III) I sought medical treatment at CCI but I was denied access to an orthopedic doctor.

g. All OSUMC Defendants who examined me, acting individually and collectively, informed me that they believe it had to be very painful when the screw broke through the right arm Humerus

bone because they could see the half screw hole left in the Humerus bone where the screw broke through the Humerus bone.

h. All OSUMC Defendants who examined me, acting individually and collectively, determined and informed me of the following:

(I) My re-broken right arm Humerus bone requires surgery, but since it has been re-broken since July 2013, there is no need for emergency surgery here in the emergency room today;

(II) We will request that you be examined by the CMC (Franklin Medical Center) hand surgeon because the ODRC does not have anyone who specializes in elbows;

(III) The ODRC has this Collegial Review Board headed by Dr. Eddy and its purpose is to save the ODRC money on prisoner's health care cost.

(IV) The Collegial Review Board is the reason we cannot do surgery today, since we do not think you will die before we can get surgery scheduled in about two (2) weeks or a month;

(V) We will request the ODRC to schedule surgery to treat your right arm Humerus fracture and implant an artificial elbow joint because that is the standard of care applicable to your injury;

(VI) The ODRC Collegial Review Board and Dr. Eddy may want us to amputate your right arm at the elbow area to save money, but you should not allow amputation;

(VII) The FMC hand surgeon will let us know whether the ODRC Collegial Review Board and Dr. Eddy will have us amputate the arm, fuse the arm at the elbow, or implant an artificial elbow.

(VIII) Do not try to lift much weight and do not get into a fight with another inmate because your right arm can easily be twisted around causing severe damage that could lead to amputation, and be real careful with your arm until we can operate on the arm.

226.    On June 26, 2015, at the OSUMC ER, the following events took place:

a. I informed all OSUMC Defendants who examined me that when I put my right arm in the sling I was given at CCI, with my arm bent at the elbow area, it pushes the broken loose Humerus bone into the meat of the right arm and after a few minutes in that position it hurts real bad.

b. I asked the OSUMC Defendants who examined me if it is ok for me to put my right hand in my pocket or hold my thumb in the waist band of my pants to stabilize my right arm at the elbow area, instead of using the sling CCI had given me, since my arm does not hurt as much in that position. In response, the OSUMC Defendants, acting individually and collectively, informed me that it is fine not to use the sling and to put my right hand in my pocket or to hold my thumb in the waist band of my pants, since that is a position of comfort.

c. I informed the OSUMC Defendants who examined me that the 1981 orthopedic surgeon moved my right arm ulnar nerve [funny bone nerve] from behind my elbow up into the front of my arm, into the soft tissue where the main vein that blood is drawn from is located, before he attached the upper arm Humerus bone to the bones of the lower arm together with the screws. The 1981 surgeon did so, to keep the bones and screws in the elbow area from aggravating the ulnar nerve.

d. One of the OSUMC Defendants who examined me, based on information and belief it was Defendant Michelson, informed me that he is the one who will be writing my written medical records, and he said, "I will write all three screws appear to be loose in the medical record."

e. In response to the OSUMC Defendant and his statement referred to in paragraph 226 d. above, I instructed and informed the OSUMC Defendant as follows:

(I) Do not just write all three screws appear to be loose in the medical record because you know Director Mohr, Dr. Eddy and the ODRC's Collegial Review are not going to want to approve and pay for the right arm elbow replacement surgery.

(II) You need to write in the medical record that the screw that had been screwed through the upper right arm Humerus bone and into the bones of the lower arm at the elbow area during a previous surgery, to attach the Humerus bone to the bones of the lower arm, has broken through the Humerus bone and the Humerus bone is completely disconnected (severed) from the bones and screws of the lower arm at the elbow area; otherwise, Director Mohr, Dr. Eddy and the ODCR's Collegial Review are not going to want to approve and pay for the right arm elbow replacement surgery that you have recommended.

227.    The June 26, 2015 Ohio State University Wexner Medical Center Rhoede Emergency Department, MRN: 970351517 written medical records that I reviewed in my medical record here at CCI, in pertinent part, provide the following information:

a. "You were seen by Edward A. Michelson, MD and Craig B. Key, MD" Id., page 1 of 6.

b. "Follow-up Information: Schedule an appointment as soon as possible for a visit with Hand CMC. Please follow up. Why: For possible surgery." Id., page 1 of 6.

c. "Discharge Orders. 06/26/15 AMB REFERRAL To Hand Clinic. Comments: Possible elbow replacement." Id., page 1 of 6.

d. "IP CONSULT TO SURGERY. Authorizing Edward A. Michelson, M.D. Requested action: Consultation and Treat hx of right elbow surgical repair, p/w pain / swelling contact No. 30705." Id., page 1 of 6.

e. "Result Narrative. EXAM: XR ELBOW 4 VIEWS, 06/26/15 10:17 A.M." Id., page 1 of 3.

f. "Clinical Indications: Hx of elbow replacement, pw elbow pain/laxity. Id., page 1 of 3.

51

g. "RELEVANT CLINICAL HISTORY 7-9-85, Findings: 4 images obtained. There has been a previous fracture of the distal humerus with posterior displacement of the capitulary and trochlear fragments which appear distracted from each other. There are 3 screws oriented in a transverse oblique orientation through the distal humerus demonstrating lucencies around all of the screws. The discord portion of the radial head is deformed and there are cortical irregularities in the articular surface consistent with arthritic changes. The trochlear groove is now well seen and appears flattened." Id., page 1 of 3.

h. "Result Impression 1. Previous fracture of the distal humerus with nonunion and development of neuropathic-like changes in the condylar fragments. All 3 screws appear loose. Electronically Signed by: Joseph S. Yu, MD on 06/26/2015, 10:20 A.M." Id., page 2 of 3.

i. "XR Elbow Right 3+ views (Acc #729245E) (order #207765263). Authorizing: Edward A. Michelson, MD. MRN: 970351517. CCI Phone 740-774-7080 (Home). Reason for Exam. HX of elbow replacement, p/w elbow pain/laxity." Id., page 2 of 3.

j. "Ordered by Andrew J. Krieger, MD. Authorizing Provider Michelson, Edward A. Acknowledged by: Kimberly Plants, RN. Acknowledged on 06/26/15, 1010 CPT CODE 73080. RA X-RAY ELBOW 3+ VW [18656]. HC Radiology Exam Elbow Complete-Min 3 views [10219742]." Id., page 2 of 3.

228.    On July 02, 2015, Defendant Mohr's Collegial Review Process was held regarding the OSUMC's June 26, 2015 request that I be examined by the ODRC's FMC Hand Surgeon Defendant Awan for consultation and scheduled to treat the Humerus fracture of my right elbow surgical repair with elbow replacement.

229.    On July 02, 2015, Defendants Mohr, Eddy, Gardner, Desmarias, Krisher, Awan, Rana, Artrip, Higginbotham and Does 1-50 who created and participated in Defendant Mohr's July 02,

2015 Collegial Review Process regarding my re-broken right arm Humerus bone, acting individually and collectively denied me the OSUMC's June 26, 2015 requested consult with Defendant Awan and denied me access to OSUMC's June 26, 2015 requested surgery to treat the Humerus fracture of my right elbow surgical repair with elbow replacement.

230.    No member of Defendant Mohr's July 02, 2015 Collegial Review Process, regarding my re-broken right arm, ever examined me between June, 25, 2015 and July 03, 2015 before:

a. Denying me access to the consultation with the Hand Clinic at CMC with Defendant Awan for possible surgery for elbow replacement, as requested by the June 26, 2015 OSUMC physicians who examined me. (CMC is presently FMC).

b. Denying me access to the right arm surgery to treat hx of right elbow surgical repair with elbow replacement, as requested by the June 26, 2015 OSUMC physicians who examined me.

231.    All members of Defendant Mohr's July 02, 2015 Collegial Review Process, regarding my re-broken right arm Humerus bone acting individually and collectively, knew and concealed the fact that the June 26, 2015 OSUMC ER xrays show a screw had broken through my right arm Humerus bone and the Humerus bone is re-broken and completely re-severed from the bones and screws of my lower right arm at the elbow area, as described in paragraph 223 above; yet, all members of the Collegial Review Process refused to provide me access to the required surgery until April 19, 2017, when Defendant Awan performed surgery at the OSUMC to implant an artificial elbow in my right arm.

232.    On June 26, 2015 my re-broken right arm Humerus bone was protruding on the wrist side of arm and the lower arm Radius and Ulna bones rotated around the upper arm Humerus bone approximately forty degrees. The right arm injury and the need for surgery were obvious to a layperson.

233. Plaintiff fully incorporates herein by reference paragraphs 207, 222, 223 and 232 of this Complaint. On July 07, 2015 at CCI DSC, I was examined by Defendant Rana and the following events took place:

a. Defendant Rana informed me that on July 02, 2015, Defendant Eddy and the Collegial Review denied the OSUMC's June 26, 2015 request for me to have an orthopedic consult with the CMC (presently FMC) Hand Clinic, Defendant Awan.

b. Defendant Rana informed me that Defendant Eddy said my right arm is not broken and I just have arthritis from an old injury.

c. I informed Defendant Rana that the June 26, 2015 OSUMC xrays show my right arm Humerus bone is re-broken, you can see the screw has broken through the Humerus bone and the upper arm Humerus bone is completely separated from the bones and screws of the lower arm at the elbow area.

d. I showed Defendant Rana how my right lower arm rotates forty (40) degrees around the upper arm Humerus bone at the elbow area and the Humerus bone was protruding on the wrist side of arm.

e. I described the June 26, 2015 OSUMC xrays and my right arm injury as set forth in paragraphs 207, 222, 223 and 232 above.

f. I requested Defendant Rana to review the June 26, 2015 OSUMC xrays of my right arm injury. Defendant Rana refused to do so.

g. I requested Defendant Rana to send me to be examined by an orthopedic surgeon. Defendant Rana refused to do so.

h. I requested Defendant Rana to request another Collegial Review Board Consult. Defendant Rana refused to do so.

i. Defendant Rana refused to provide me any treatment for my re-broken right arm Humerus bone.

j. Defendant Rana said, "Once Director Mohr's Collegial Review and Dr. Eddy say you just have arthritis, there is nothing else I can do. I will lose my job, if I go against them."

234.     Plaintiff fully incorporates herein by reference paragraphs 207, 222, 223 and 232 of this Complaint. On July 09, 2015 at CCI DSC, I was examined by Defendant Artrip and the following events took place:

a. Defendant Artrip informed me that on July 02, 2015, Defendant Eddy and the Collegial Review denied the OSUMC's June 26, 2015 request for me to have an orthopedic consult with the CMC (presently FMC) Hand Clinic, Defendant Awan.

b. Defendant Artrip informed me that Defendant Eddy said my right arm is not broken and I just have arthritis from an old injury.

c. I informed Defendant Artrip that the June 26, 2015 OSUMC xrays show my right arm Humerus bone is re-broken, you can see the screw has broken through the Humerus bone and the upper arm Humerus bone is completely separated from the bones and screws of the lower arm at the elbow area.

d. I showed Defendant Artrip how my right lower arm rotates forty (40) degrees around the upper arm Humerus bone at the elbow area and the Humerus bone was protruding on the wrist side of arm.

e. I described the June 26, 2015 OSUMC xrays and my right arm injury as set forth in paragraphs 207, 222, 223 and 232 above.

f. I requested Defendant Artrip to review the June 26, 2015 OSUMC xrays of my right arm injury. Defendant Artrip refused to do so.

g. I requested Defendant Artrip to send me to be examined by an orthopedic surgeon. Defendant Artrip refused to do so.

h. I requested Defendant Artrip to request another Collegial Review Board Consult. Defendant Artrip refused to do so.

i. Defendant Artrip refused to provide me any treatment fo my re-broken right arm Humerus bone.

j. Defendant Artrip informed me that since Defendant Eddy and the Collegial Review denied me the orthopedic consult requested by the OSUMC on June 26, 2015, there is nothing anyone here at CCI can do about my right elbow.

k. I informed Defendant Artrip that the pain in my right arm is getting worse, and I tried to explain, but Defendant Artrip stopped me. Defendant Artrip said, "We cannot talk about it anymore. We are done."

235.    Plaintiff fully incorporates herein by reference paragraph 37 of this Complaint:

a. Although not necessary or appropriate, as stated in paragraph 37 above, I timely and properly exhausted the ODRC's Grievance Procedure under Ohio Administrative Code 5120-9-31 in Grievance #CCI-07-15-000119 regarding the July 02, 2015 ODRC Collegial Review decision, Defendant Rana's July 07, 2015 decision and Defendant Artrip's July 09, 2015, decision, denying me access to the necessary medical examinations, treatment and surgery to repair my painful, obviously re-broken right arm Humerus bone injury, as set forth below:

(I) On July 09, 2015, I timely filed an Informal Complaint Resolution (ICR) with Defendant Higginbotham, CCI Health Care Administrator; On July 22, 2015, I timely filed my Notification of Grievance (Grievance) with Defendant Free, CCI Institution Inspector, Grievance #CCI-07-15-000119; and, on August 01, 2015, I timely filed my Appeal to the Chief Inspector;

(II) My ICR, Grievance, and Appeal to the Chief Inspector, Grievance #CCI-07-15-000119,

stated in pertinent part, the following: On 06-26-15, the Ohio State Wexner Medical Center ER

took four xrays of my right elbow; One xray showed the right Humerus bone (upper arm) is

broken in half, separated, not attached to anything at the elbow area; The C.C.I. xrays do not

show the broken, separated Humerus bone, but the OSU xrays do; Just before 07-18-13, I threw

a softball and felt extreme pain like a bone or screw had broken and the lower arm bones (Radius

and Ulner) rotates around the Humerus 40 degrees while arm was hanging straight down from

elbow, and it never did that before.

(III) On July 17, 2015, Defendant Higginbotham's written response to my July 09, 2015 Informal

Complaint (Grievance #CCI-07-15-000119) states, in the pertinent part; Per our meeting on 7-

17-15, I reviewed xray results from Collegial Review decision for right elbow. Currently the plan

is to follow locally. I will pass you for (unintelligible) on DSC for increased discomfort and

functional limits.

(IV) On July 29, 2015, Defendant Free wrote his Disposition of Grievance, Grievance #CCI-07-

15-000119, which states in the pertinent part: To investigate your grievance I interviewed HCA

B. Higginbotham. I have also reviewed your medical file and 68-MED-01 and 68-MED-14, You

have increased pain with some swelling and redness. You were seen at OSU on 6/26/15 and x-

rays revealed the previous fracture with arthritic changes. You were recommended to follow up

with an orthopedic doctor and FMC. Collegial Review denied the consult and recommends an

alternate plan of care on 7/2/15. You were continued on Mobic for arthritis.

(V) On September 11, 2015, Mona Parks R.N., Assistant Chief Inspector filed the Decision of

the Chief Inspector on a Grievance Appeal, Grievance #CCI-07-15-000119, affirming Defendant

Free's July 29, 2015, Disposition of Grievance. Copies attached hereto.

236.    On July 17, 2015, Defendant Higginbotham, CCI Health Care Administrator (HCA), interviewed me regarding the Informal Complaint I had filed with her in my Grievance No. CCI-07-15-000119, and informed me that she was going to have me go back to Doctor's Sick Call here at CCI, to get the CCI doctors to recommend an orthopedic consult at FMC to see if the Collegial Review Board in Columbus will approve an orthopedic consult. I never got a DSC pass to see a doctor, so I signed up for Nurses Sick Call.

237.    On August 10, 2015, I submitted a Health Care Request Form regarding my re-broken right arm. On August 12, 2015, I went to Nurses Sick Call (NSC).

238.    On August 17, 2015, at CCI Doctors Sick Call, I was examined by CCI Nurse Practitioner Defendant Artrip who informed me he was going to send another request to the Collegial Review Board regarding the fact that my right arm is obviously re-broken and I have increased pain.

239.    On September 10, 2015, at FMC orthopedics, Dr. Sullivan acknowledged that my right arm Humerus bone is re-broken and severed in half, and I need an artificial elbow. Dr. Sullivan said: "the problem is, we do not have anyone who specializes in elbows; elbow replacements are not as common as hip and knee replacements; since OSU requested a consult with our hand surgeon, I will reschedule you to see the hand surgeon, and I will contact some of my other colleagues to see what we can do for you."

240.    The September 10, 2015, written Consult Report by FMC orthopedics Dr. Sullivan that I reviewed in medical record here at CCI, in pertinent part; provides the following information:

a. 556425N; Dr. Sullivan; Consultation Request; Request Date 8-17-15;

Appointment Date 9-10-15;

b. x-ray (June 2015 OSU) shows nonunion Distal Humerus Hardware failure; full rotation @

actual elbow joint; Difficult Alp u usteb 6 nonunion; Rt elbow slpine-fracture Distal Humerus;
OSU# 97035517 Medical Record No.

c. will discuss with colleagues; F\u Hand Clinic next Month;

d. Pt had Rt elbow fix aterior 1981-Re-fractured 2013. Chronic Nonunion now has flail elbow.
Says he has H\o ulnar nerve damage from original accident; Now small finger more numbs
Adduction.

241.     On October 01, 2015, at FMC (formerly CMC), I was examined by the FMC Hand
Surgeon Defendant Awan, who performed a cursory review of my right arm injury and the
following events took place:

a. Defendant Awan said, "You have arthritis from a previous injury and you want an artificial
elbow. The ODRC will not pay for you to get an artificial elbow. You are too young for an
artificial elbow."

b. I informed Defendant Awan that the June 26, 2015, OSUMC xrays show my right arm
Humerus bone is re-broken and completely severed from the bones and screws of the lower arm
because the screw that was threaded through the upper right arm Humerus bone has broken
through the Humerus bone and you can see the half screw hole where the screw broke through
the Humerus bone.

c. I showed Defendant Awan how my lower right arm rotates around the upper right arm
Humerus bone approximately forty five (45) degrees at the elbow area, in ways an arm is not
supposed to rotate, and I explained that it is painful.

d. I requested Defendant Awan to review the June 26, 2015, OSUMC xrays of my right arm, but
Defendant Awan refused to do so, and refused to provide any treatment.

e. After the events stated in paragraph 241-241(d) above, I informed Defendant Awan that when

59

I am sleeping and my right arm bends back at the elbow area, in ways an arm is not supposed to bend, it causes severe pain when it stretches the nerves and tendons of my right arm elbow area. I showed Defendant Awan how the right arm bends backward, in ways an arm is not supposed to bend.

f. I asked Defendant Awan to at least give me a brace to sleep in so my arm will not bend backwards when I am sleeping.

g. After the events stated in paragraph 241-241(f) above, Defendant Awan had FMC xray Department give me a brace for my obviously re-broken, painful right arm injury.

242.    Plaintiff fully incorporates herein by reference paragraph 234 of this complaint:

a. On October 06, 2015 at CCI DSC, I was examined by Defendant Artrip, for round trip follow-up regarding my October 01, 2015 examination by FMC Hand Surgeon Defendant Awan, and the following events took place:

(I) I reiterated the events and facts stated in paragraph 234 (b, c, d, e, f, h, and i) with Defendant Artrip;

(II) Defendant Artrip informed me that since Defendants Awan, Eddy, and the Collegial Review, Defendant Does 1-50, had determined that I have pain from only arthritis there is nothing he or anyone at CCI can do about my right arm, and directed me to take NSAIDS for right arm arthritis pain and re-ordered ZIKS Arthritis Cream.

243.    On May 09, 2016, I sent a Health Services Request to the CCI Infirmary because on May 08, 2016, my right elbow starting oozing fluid. My Health Services Request stated:

a. My right-elbow is oozing fluid, plasma-blood mixture or infection. It may be caused by a loose screw or bone fragment that broke through the Humerus bone the 06-26-2015 OSU xrays show. Also, back/leg pain. May need tegretol increased or steroid.

b. Sometime after May 09, 2016, I was examined by a CCI nurse at NSC, but by then, the fluid had stopped oozing from my right-elbow and the nurse did not schedule me to see a doctor.

244.    On June 16, 2016, at CCI CCC Nurse Practitioner (NP) Dove ordered an xray of my back.

245.    On June 17, 2016, at the CCI xray Department, a CCI xray technician xrayed my back and the following events took place:

a. The June 17, 2016, CCI xray technician and I saw and reviewed the June 11, 2015 CCI xrays of my right arm elbow area;

b. The June 11, 2015, CCI xray of my right arm elbow area shows my right arm Humerus bone was obviously misaligned, protruding forward toward wrist side of arm approximately 3/4 inch, from the bones of my lower arm at the elbow area. The need for surgery was obvious to a lay person.

c. After the events stated in paragraph 244 and 245 (a-b) above, I realized and discovered the facts stated in paragraph 246 below.

246.    Defendant Rana, all individually named defendants and Defendant Does 1-50 who had a duty to review, or who had seen, the June 11, 2015 CCI xrays of my right arm elbow area, acting individually and collectively, had:

a. Knowingly and purposely concealed, and or conspired to conceal, the facts that one of the June 11,2015, CCI xrays of my right arm elbow area shows my right arm Humerus bone is obviously misaligned, protruding forward toward the wrist side of arm approximately 3/4 inch, from the bones of my lower arm at the elbow area;

b. Falsified my medical records by concealing the facts stated in paragraph 245 (b) when writing the xray Reports regarding the June 11, 2015, CCI xrays of my right arm elbow area.

247. On July 25, 2016, I sent a Health Services Request to the CCI Infirmary regarding my right arm pain caused by my re-broken right arm Humerus bone.

248. From June 26, 2015, to April 19, 2017, when Defendant Awan performed surgery to implant an artificial elbow in my right arm, the following events took place:

a. I continued to complain about pain caused by my obviously re-broken right arm injury to all ODRC, CCI and FMC employees, agents or servants who examined me, or consulted with me, individually named Defendants and Defendant Does 1-50;

b. I showed all individually named Defendants and Defendant Does 1-50 who examined me or consulted with me how my obviously re-broken right arm Humerus bone protruded on wrist side of arm at the elbow area and how my lower arm rotated around my upper right arm Humerus bone at the elbow area, as if wringing water from a washcloth.

249. On October 3, 2016, at CCI, I had a Telemedicine (hereinafter "Tele-med") audiovisual doctor appointment with OSUMC Neurosurgeon James B. Elder, MD about back surgery. During the October 3, 2016, Tele-med appointment, after Dr. Elder and I determined and agreed I need and want back surgery if Dr. Elder can get the ODRC Defendants to approve the surgery, the following events took place:

a. Dr. Elder asked me if I had any questions. In response, I asked Dr. Elder if I was at risk of losing my right arm due to severe nerve damage when my arm moves like this, and I twisted the bones of my lower arm 160 degrees around the upper arm Humerus bone at the elbow area, as if wringing water from a washcloth. Dr. Elder jumped in his chair, jerking his head around, appearing to be shocked by the sight of the injury and said, "Oh! Don't do that. Why don't you see a doctor," I said, "I did." I explained the June 26, 2015, OSUMC xrays to Dr. Elder and I

said, "I think OSUMC sent the ODRC the wrong xrays because all ODRC doctors say my 'arm is not re-broken and I just have arthritis.'"

b. Dr. Elder turned to his computer and reviewed the June 26, 2015, OSUMC xrays of my right arm. Dr. Elder said, "No, Mr. Grove, OSUMC provided the ODRC the correct xrays. The xray shows the screw has broken through your right arm Humerus bone and the Humerus bone is severed from the bones of the lower arm." Dr. Elder described the June 26, 2015, OSUMC xrays of my right arm and the OSUMC's June 26, 2015, recommendation, as set forth in paragraphs 223 and 227 above in this Complaint, and said, "I cannot believe any doctor you showed that arm to says it is just arthritis." I said, "They do." Dr. Elder said, "I will contact the ODRC about needed surgery on your right arm."

250.    After Dr. Elder informed me that OSUMC had provided the correct June 26, 2015 OSUMC xrays to the ODRC, I timely exhausted the Grievance Procedure, under Grievance #CCI-11-16-000022, by filing an Informal Complaint, Notification of Grievance, and Appeal to the Chief Inspector alleging an ONGOING deliberate indifference to my right arm injury since July 2013 and a fraud claim for knowingly concealing the true nature of my obvious right arm injury and knowingly concealing the fact that the June 26, 2015, OSUMC xrays reveal my arm is re-broken. This ICR, Grievance and Appeal include the names and dates of all doctors I saw and complained to at Doctors Sick Call or Chronic Care Clinic every three months since July 2013, Dr. Awan at Franklin Medical Center (FMC) on October 1, 2015, and all other ODRC agents responsible for my medical care.

251.    On October 27, 2016, at the OSUMC, I was examined by Dr. Elder about needed back surgery. Dr. Elder informed me that he had contacted the ODRC about needed surgery on my

right arm, but the ODRC's individually named Defendants and/or Defendant Does 1-50 denied his recommendation to perform needed surgery on my right arm.

252.    On November 23, 2016, at OSUMC Dr. Elder performed a laminectomy back surgery to repair my bulging disk and spinal stenosis that was causing pain, paralysis and drop foot. Based on information and belief, Dr. Elder consulted OSUMC orthopedics about my re-broken right arm. On November 24, 2016, OSUMC orthopedic Department took new xrays of my right arm and, based on information and belief, requested the ODRC to grant permission for OSUMC to perform elbow replacement surgery.

253.    Based on information and belief, Defendants Eddy, Gardner, Krisher, Desmarias and Does 1-50 members of the ODRC's Collegial Review Board and Collegial Review Process and/or other Defendant Does 1-50 denied OSUMC's November 24, 2016 request to allow OSUMC to perform elbow implant surgery to repair my re-broken right arm Humerus bone.

254.    I timely exhausted the ODRC's Grievance Procedure, under Grievance #CCI-05-17-000061, regarding the ODRC's denial of OSUMC's November 24, 2016, request to provide surgical repair of my re-broken right arm Humerus bone. The CCI Institutional Inspector, Defendant Free's, Disposition of Grievance dated 05/23/17 denied my Grievance stating, "Collegial Review is a final decision that is rendered by central office staff and therefore is not appropriate for the grievance procedure." On 06/26/2017, the ODRC Assistant Chief Inspector Karen Stanforth affirmed Defendant Free's Disposition of Grievance. Copy attached to this Complaint.

255.    Between December 01, 2016, and December 02, 2016, at FMC, while recovering from back surgery, FMC medical staff informed me that I was scheduled for an OSUMC neurosurgeon consult for my back and an orthopedic consult for my re-broken right arm injury. I

never received the orthopedic consult for my re-broken right arm injury. I was transferred from FMC back to CCI on December 09, 2016.

256.     On February 08, 2017, at CCI DSC, I was examined by Nurse Practitioner (NP) Dove and the following events took place:

a. NP Dove informed me that the OSUMC neurosurgeons cleared me saying the January 19, 2017, back xrays show my back has heeled good;

b. I asked NP Dove if there is any decision from Defendant Eddy and the Collegial Review regarding OSUMC's November 23, 2016, through December 02, 2016, request to perform surgery for my re-broken right arm. In response, NP Dove informed me that she does not see anything on the OSUMC's request or denial of the request;

c. NP Dove informed me that she will submit a request to Dr. Eddy and the Collegial Review for me to be examined by the FMC Hand Surgeon Defendant Awan again.

257.     On Wednesday, February 22, 2017, at CCI DSC, I was examined by NP Dove and the following events took place:

a. NP Dove informed me that CCI had a Collegial Review Board Process scheduled for Thursday February 23, 2017, and NP Dove wanted a new xray of my right arm to show Dr. Eddy and the Collegial review;

b. NP Dove sent me to the CCI xray Department to have an xray of my right arm taken;

258.     On February 22, 2017, at the CCI xray Department, the CCI xray technician took xrays (4 views) of my re-broken right arm.

259.     On March 14, 2017 at CCI CCC, I was examined by NP Dove and the following events took place:

a. NP Dove informed me that the Collegial Review had wanted the February 22, 2017, xrays of my right arm, but she has not gotten a decision from the Collegial Review yet.

b. NP Dove informed me that she still does not see anything on the Collegial Review Board's decision regarding the OSUMC's November 23, 2016, through December 02, 2016, request to perform surgery to repair my re-broken right arm.

260. On March 20, 2017, ODRC/CCI-Medical (7407747095) received the Bone & Joint Institute of South Georgia's Medical Records Release requesting me to authorize the Bone & Joint Institute of South Georgia to release to my brother a copy of my medical records the Bone & Joint Institute of South Georgia had received regarding the June 26, 2015, OSUMC Medical records pertaining to my re-broken right arm Humerus Bone injury.

261. On March 22, 2017, at CCI Medical Records Department, I signed a Medical Records Release authorizing the Bone & Joint Institute of South Georgia to release to my brother a copy of my medical records the Bone & Joint Institute of South Georgia had received.

262. On March 26, 2017, I filed an Informal Complaint with CCI HCA, Defendant Higginbotham inquiring about the OSUMC's November 23, 2016, through December 02, 2016, request to perform surgery for my re-broken right arm injury and the Collegial Review Board Decision.

263. On April 03, 2017, during a meeting with the CCI HCA regarding my March 26, 2017, Informal Complaint inquiring about the OSUMC's 11-23-16 through 12-02-16 request, CCI HCA Defendant Higginbotham informed me that she did not see anything from Dr. Eddy and the Collegial Review on OSUMC's 11-23-16 through 12-02-16 request to perform surgery on my right arm injury, but if the request was made by OSUMC and denied by ODRC, it would have been denied by Dr. Eddy and the Collegial Review Board.

264.    On April 06, 2017, at FMC, I was examined by the FMC Hand Surgeon Defendant Awan. Defendant Awan informed me that he will schedule surgery for an artificial elbow implant to repair my re-broken right arm Humerus Bone injury.

265.    On April 16, 2017, I filed my second ongoing deliberate indifference to my serious medical needs Informal Complaint, followed by Grievance #CCI-05-17-000061 and Appeal to the Chief Inspector to exhaust the grievance procedure regarding denying the OSUMC's November 23, 2016, through December 02, 2016, request to treat my re-broken right arm Humerus bone injury and not receiving the orthopedic consult for my re-broken right arm Humerus bone injury that FMC medical staff had on 12-01-16 and 12-02-16 informed me was scheduled.

266.    On April 18, 2017, I was transferred to FMC for right arm surgery preparation.

267.    On April 19, 2017, at OSUMC, Defendant Awan performed artificial elbow implant surgery to repair my re-broken right arm Humerus bone injury.

268.    On June 06, 2017, at CCI xray, an xray was taken of my right arm.

269.    On June 08, 2017, at FMC, Defendant Awan was dissatisfied with my right arm rehabilitation and ulner nerve strength. Defendant Awan informed me that he will schedule my return for my follow-up examination in two months.

270.    On June 08, 2017, at FMC, Defendant Awan informed me he had prescribed Tylenol 3 for 30 days for my right arm pain, so I could continue my right arm rehabilitation to increase right arm ulner nerve strength and to increase the mobility to straighten my right arm. I was not prescribed the Tylenol 3 pain medication Defendant Awan informed me he prescribed. I continued to suffer right arm pain and the pain interfered with and limited the progress on my rehabilitation exercises to strengthen and straighten my right arm.

271.    I was not returned to FMC for the two months follow-up examination Defendant Awan informed me, on June 08, 2017, he had scheduled to re-assess my right arm injury.

272.    After the events stated in paragraphs 269 through 271 of this Complaint, I was informed that medical round trips to FMC had been temporarily canceled because inmates at FMC had been diagnosed with Legionnaires disease and FMC was trying to find the cause. Thereafter, someone showed me a newspaper article that informed me of the Legionnaires disease outbreak at FMC.

273.    In January 2018 I was informed that medical round trips were going to FMC again. I had not been taken to FMC to be examined by Defendant Awan for the follow-up examination Defendant Awan had, on June 08, 2017, informed me he had scheduled.

274.    On January 12, 2018, I filed my third ongoing deliberate indifference to my serious medical needs Informal Complaint, under Grievance #CCI0118000314, page 1 of 2, and #CCI0118000316, page 2 of 2, regarding the denial of the two months follow-up examination Defendant Awan had, on June 08, 2017, informed me he had scheduled to re-assess my right arm injury.

275.    On February 19, 2018, at CCI xray, an xray of my right arm was taken.

276.    On March 01, 2018, at FMC Hand Clinic, I was examined by Defendant Awan. Defendant Awan informed me that he had reviewed the February 19, 2018, CCI xrays of my right arm and the bone graph and artificial elbow implant look good.

277.    On March 05, 2018, at CCI DSC, I was examined by NP Dove for round trip follow-up regarding the March 01, 2018, examination by FMC Hand Surgeon Defendant Awan. NP Dove informed me that Defendant Awan had cleared me from his care regarding my right arm injury.

278.    After the events stated in paragraph 228 of this Complaint, my brother and I attempted to

obtain a copy of the June 26, 2015, OSUMC medical records, including the June 26, 2015,

OSUMC xrays of my right arm.

279.    On July 31, 2015, I executed an OSUMC Authorization For Release of Medical

Information authorizing OSUMC to release a copy of the June 26, 2015, OSUMC Medical

records and xrays of my right arm to my brother.

280.    Based on information and belief, after July 31, 2015, my brother requested a copy of the

June 26, 2015, OSUMC medical records and xrays of my right arm, and my brother offered to

pay any fee required.

281.    Based on information and belief, on August 12, 2015, Jenny M. ,OSUMC Medical

Information Management, informed my brother that "pursuant to Ohio Revised Code,

5120.21(C)(2), inmate medical records can only be released to a licensed attorney at law or a

licensed physician, with the warden's written authorization, and not more than once every twelve

months."

282.    On September 21, 2015, at the CCI HCA office, Defendant Higginbotham informed me

that the OSUMC sent CCI a request I had made to have OSUMC release my medical records to a

family member, but my medical records cannot be released to anyone but a physician or an

attorney.

283.    After the events stated in paragraphs 278 through 282 of this Complaint, my brother

obtained the assistance of J. Lex Kenerly, III M.D. ("hereinafter Dr. Kenerly") Orthopaedic

Surgeon, Bone & Joint Institute of South Georgia.

284.    Based on information and belief, Dr. Kenerly offered his pro bono assistance to my

brother as follows:

a. To obtain the June 26, 2015, OSUMC medical records and xray images of my right arm;

b. To review the June 26, 2015, OSUMC medical records and xray images of my right arm;

c. After reviewing the June 26, 2015, OSUMC xrays of my right arm, if Dr. Kenerly agrees that my right arm Humerus bone has been re-broken and is severed from the bones and screws of the lower arm at the elbow area, as described in paragraph 223 of this Complaint, then Dr. Kenerly will provide his pro bono assistance to my brother and me , including providing affidavits and trial testimony if needed, to get my re-broken right arm injury surgically repaired under the standard of care applicable to my right arm injury.

285.    On June 21, 2016, I executed an OSUMC Authorization For Release of Medical Information authorizing OSUMC to release, to J. Lex Kenerly, III M.D. (hereinafter "Dr. Kenerly") Orthopaedic Surgeon, Bone & Joint Institute of South Georgia, a copy of the OSUMC July 09, 1985, and the June 26, 2015, xrays, xray images, and medical records regarding my right arm, and any other medical records requested by Dr. Kenerly. I had the OSUMC Authorization For Release of Medical Information notarized by my CCI F-1 Dorm Notary Cherri Barch Marshall on 6/21/16.

286.    On June 28, 2016, I executed a "request and Authorization to Release Medical Records to Designated Physician" requesting and authorizing the Ohio Department of Rehabilitation and Corrections (ODRC) and its employees, agents and/or assigns to release to Dr. Kenerly a certified copy of any and all of my health care information and medical records including, but not limited to the following: x-rays, MRI images,...and other medical documentation as requested by J. Lex Kenerly, III M.D., which are contained in my medical records maintained by the ODRC or its facilities, including SOCF, CCI, FMC, LeCI as well as the Ohio State University Wexner Medical Center (OSUMC).

287.    On or about June 28, 2016, I provided Dr. Kenerly an original duplicate of the two (2) documents referred to in paragraphs 285 and 286 of this Complaint, and I mailed, via U.S. Mail first class postage prepaid, an original duplicate of the same documents to the ODRC.

288.    Based on information and belief, between June 21, 2016, and September 14, 2016, Dr. Kenerly and I properly requested, pursuant to Ohio Revised Code 5120.21(C)(2) and ODRC policies, a copy of the July 09, 1985, and June 26, 2015, OSUMC medical records regarding my OSUMC right arm examinations, including the June 26, 2015, OSUMC xrays of my right arm.

289.    Based on information and belief, Defendants John and or Jane Does 1-50 provided Dr. Kenerly a thirty-two (32) page OSUMC and FMC written medical record response to Dr Kenerly's September 14, 2016, OSUMC Medical Record Request to obtain a copy of all the July 09, 1985, and June 26, 2015, OSUMC xrays, xray images and medical records regarding my right arm. Said written medical record response to Dr. Kenerly's September 14, 2016, medical record request:

a. Did not contain any of the four (4) VIEWS of the June 26, 2015, OSUMC xrays, or xray images of my right arm;

b. Did not contain any of the four (4) VIEWS of the July 09, 1985, OSUMC xrays, or xray images of my right arm;

c. Concealed the facts that the June 26, 2015, OUSMC xrays of my right arm shows the following:

(I) A screw that had been screwed through my upper right arm Humerus bone and into the bones of the lower arm at the elbow area, during a previous surgery, to attach the Humerus bone to the bones of the lower arm has broken through the Humerus bone and the Humerus bone is completely disconnected (severed) from the bones and screws of the lower arm;

(II) The screw that has broken through the Humerus bone is attached to the bones of the lower arm on one end at the elbow area, and the other end of the screw is protruding out from the bones of the lower arm at the elbow area approximately three-fourths of an inch (3/4");

(III) The half screw hole through the Humerus bone where the screw broke through the Huemrus bone and came loose on that end;

(IV) My right arm Humerus bone is re-broken, completely broken in half (severed) at the elbow area and only muscles, tendons, and nerves attach the Humerus bone (upper arm) to the elbow area or lower arm.

290. Based on Plaintiff's personal knowledge, information and belief, after receiving the thirty-two (32) page OSUMC response to Dr. Kenerly's September 14, 2016, OSUMC medical records request, as referred to in paragraphs 288 and 289 above, and realizing the response was incomplete and no x-rays were provided, Dr. Kenerly notified the OSUMC of such, and again requested the July 9, 1985, and June 26, 2015, x-rays and original June 26, 2015, OSUMC medical records relating to Plaintiff.

291. Based on Plaintiff's personal knowledge, information and belief, Dr. Kenerly did not receive a response to his OSUMC medical record request referred to in paragraph 290 above.

292. Based on Plaintiff's personal knowledge, information and belief, Dr. Kenerly informed my brother that Dr. Kenerly could not provide Dr. Kenerly's medical opinion regarding whether the Defendants have or have not deviated from the standard of care applicable to Plaintiff's right arm humerus bone injury without reviewing all the June 26, 2015, OSUMC medical records, including x-rays and/or x-ray images related to the OSUMC's June 26, 2015, examination of Plaintiff's right arm humerus bone injury

293. ODRC nor CCI allows Plaintiff or any ODRC inmate to receive a copy of their medical records via regular U.S. Mail. The only way Plaintiff and all other similarly situated prisoners can obtain a copy of their medical records is when the medical records are received as legal mail from an attorney or by court order.

294. Plaintiff's brother retained the services of Smith & Phelps, Joseph L. Phelps, III, attorney's at law to mail Plaintiff a copy of the medical

records Dr. Kenerly received in response to Dr. Kenerly's request referred to in paragraphs 288 and 289 above.

295. On March 30, 2018, via CCI legal mail, Plaintiff received legal mail from Joseph L. Phelps, III, of Smith & Phelps, attorney's at law whose primary business address is Jesup, Georgia. Based on Plaintiff's personal knowledge, information and belief, said legal mail contained a true and accurate copy of the thirty-two (32) page medical record response Dr. Kenerly received in response to Dr. Kenerly's September 14, 2016, OSUMC medical records request referred to in paragraphs 288 and 289 above.

296. Only pages 1 of 32 and pages 8 of 32 through page 20 of 32 of the medical records referred to in paragraph 295 above are related to the June 26, 2015, OSUMC examination and x-rays of Plaintiff's right arm humerus bone injury.

297. The medical records referred to in paragraph 295 above do not contain any medical records referring to OSUMC Dr. Craig B. Key June 26, 2015, examination of Plaintiff's right arm humerus bone injury.

298. The medical records referred to in paragraph 295 above do not contain any x-rays or x-ray images.

299. Page 1 of 32 of the medical records referred to in paragraph 295 above is the OSUMC Authorization for Release of Medical Information referred to in paragraph 285 above of which Plaintiff executed authorizing the OSUMC to release Plaintiff's medical information to Dr. Kenerly. Said authorization for release of medical information, (pg.1 of 32), contains additional information that indicates it was received by OSUMC and/or its agents on August 31, 2016, and September 13, 2016.

74

300. The medical records referred to in paragraph 295 above that are related to the June 26, 2015, OSUMC examination and x-rays of Plaintiff's right arm humerus bone injury contain Defendant Michelson's OSUMC medical record filed on October 14, 2015, Defendant Krieger's OSUMC medical record filed on June 26, 2015, and Defendant Yu's OSUMC medical record electronically signed on June 26, 2015.

301. After reviewing the medical records referred to in paragraphs 295 and 300 above, Plaintiff states based Plaintiff's personal knowledge, information and belief that Defendants Michelson, Krieger, Ryu, and Yu, knowingly and purposely concealed the true nature and severity of Plaintiff's right arm humerus bone injury when each Defendant filed medical records that deliberately concealed the facts stated in paragraphs 223 through 223(c) and 289(c)(I-IV) of this Complaint. Plaintiff fully incorporates herein by reference paragraphs 223 through 223(c) and 289(c)(I-IV) of this Complaint.

302. The OSUMC medical records referred to paragraphs 295 and 300 of this Complaint revealed to Plaintiff that Defendants Michelson, Krieger, Ryu and Yu, filed electronic and/or printed OSUMC medical records regarding their June 26, 2015, OSUMC examination and x-rays of Plaintiff's re-broken right arm humerus bone that intentionally provided a vague description of what the June 26, 2015, OSUMC x-rays show in a fraudulent attempt to:

a) conceal the facts that the June 26, 2015, OSUMC x-rays reveal the facts stated in paragraphs 223 through 223(c) and 289(c)(I-IV) of this Complaint;

b) conceal the urgent need for surgery to repair Plaintiff's re-broken right arm humerus bone;

c) conceal the fact that said Defendants knowingly and purposely acted with deliberate indifference to Plaintiff's serious medical needs when said Defendants released Plaintiff from the OSUMC without first providing the necessary surgery to treat Plaintiff's re-broken right arm humerus bone;

d) conceal the fact that said Defendants knowingly and purposely acted with negligence when said Defendants released Plaintiff from the OSUMC without first providing the necessary surgery to treat Plaintiff's re-broken right arm humerus bone;

e) conceal the fact that Plaintiff's re-broken right arm injury put Plaintiff at serious risk of serious harm, perhaps even death, if not treated immediately; yet, said Defendants released Plaintiff from their care without providing the necessary surgery to repair Plaintiff's re-broken right arm humerus bone.

303. The contract referred to in paragraphs 32 and 33 of this Complaint entered into by Defendant Mohr and Defendant Does 1-50 agents[ii] servants, or employees of the OSUMC required Defendants Michelson, Krieger, Ryu and Yu, to commit the acts and omissions stated in paragraphs 302 of this Complaint.

304. The OSUMC medical records referred to in paragraphs 295 and 300 of this Complaint revealed to Plaintiff that Defendant Krieger, knowingly and purposely falsified the OSUMC medical records he filed on June 26, 2015, at 4.04 PM related to Defendant Krieger's June 26, 2015, examination of Plaintiff's right arm and x-rays when Defendant Krieger stated that Plaintiff:

a) denied any history of trauma;

b) did not not know what surgery was done but stated that it was for a fracture.

305. The OSUMC medical records referred to in paragraphs 295 and 300 of this Complaint revealed to Plaintiff:

a) that Defendant Ryu, knowingly and purposely falsified the OSUMC medical record he file on June 26, 2015, @ 2:59 PM related to Defendant Ryu's examination of Plaintiff's right arm and x-rays when Defendant Ryu stated that Plaintiff "denies any recent injury or trauma to right elbow;"

b) that Defendant Ryu consulted with Defendant Awan regarding Plaintiff's June 26, 2015, OSUMC examination, x-rays, and recommended treatment of Plaintiff's re-broken right arm humerus bone;

c) that on July 6, 2015, Defendant Awan co-signed Defendant Ryu's plan of treatment.

306. Because of the more than three-year delay by all Defendants, except Defendants Houts and Bottorff, acting individually and collectively, in providing adequate treatment to Plaintiff for Plaintiff's serious, painful, re-broken right arm humerus bone injury, Plaintiff suffers ongoing health problems and deterioration of Plaintiff's overall health and quality of life.

307. All Defendants, except Defendants Houts and Bottorff, acting individually and collectively, knowingly and purposely acted with obduracy and wantonness to unnecessarily and intentionally inflict unnecessary pain, deterioration of right arm and risk of more serious harm upon Plaintiff when said Defendants knowingly and purposely delayed adequate treatment to Plaintiff for Plaintiff's documented painful, re-broken, re-severed right arm humerus bone injury.

308. The medical assistance administered by all Defendants, except Defendants Houts and Bottorff, acting individually and collectively, to Plaintiff's painful, re-broken right arm humerus bone injury was so woefully inadequate as to amount to no treatment at all from July 2013 through April 19, 2017.

309. All Defendants, except Defendants Houts and Bottorff, acting individually and collectively, have acted with deliberate indifference to Plaintiff's serious medical needs regarding Plaintiff's painful, re-broken right arm humerus bone injury.

310. As a result of the deliberate indifference of all Defendants, except Defendants Houts and Bottorff, acting individually and collectively, to

Plaintiff for Plaintiff's painful, re-broken right arm humerus bone injury, Plaintiff has suffered pain, emotional distress and a marked deterioration of Plaintiff's overall health.

311. All Defendants, except Defendants Houts and Bottorff, acting individually and collectively, have acted with malicious purpose, in bad faith and/or in a wanton and reckless manner regarding Plaintiff's painful, re-broken right arm humerus bone injury.

312. Plaintiff reserves paragraphs [312 through 400] for amendments if and when necessary after obtaining discovery or otherwise.

FACTS CONCERNING SYSTEMIC FAILURES IN ODRC's HEALTH CARE SYSTEM

401.     Plaintiff fully incorporates herein by reference paragraphs 1 through 400 of this Complaint as if said paragraphs were fully set forth herein.

402.     The foregoing facts set forth systemic failures in ODRC's Health Care System.

403.     Defendants have known for several rears of the existence of these systemic medical care problems, and the fact that these problems put prisoners at substantial risk if death or serious physical harm. Defendants, however, have refused to take appropriate action to address these problems.

404.     Gregory Stamper, a former ODRC inmate in Allen Correctional Institution in Lima, Ohio, suffered from peripheral neuropathy that caused him prolonged pain, numbness and dizziness. As a result of Defendants Mohr, Eddy, Gardner, Bottorff, Krisher, Desmarias, Rana, Artrip, Houts, Higginbotham and Does 1-50's created, implemented, approved and applied ODRC policies, regulations, protocols, customs and usages, ODRC prison doctors cancelled Gregory Stamper's nerve pain medication.

405.     After the events stated in paragraph 404 above, Gregory Stamper committed suicide to get out of pain. Gregory Stamper hanged himself on June 1, 2011, the day after ODRC Dr. Myron Shank, Stamper's treating physician at Allen Correctional Institution, cancelled an appointment that Stamper sought for his pain.

406.     According to a newspaper article that Plaintiff read reporting Gregory Stamper's suicide:

   a.     Gregory Stamper called his family, I believe his mother, and informed his mother that prison doctors had cancelled his pain medication and his pain was so bad that he was going to have to kill himself to get pain relief;

b.    Gregory Stamper's family, I believe his mother, called the ODRC and or Allen Correctional Institution informing ODRC officials that Gregory Stamper called her and informed her that if prison doctors do not give Gregory Stamper his pain medication he said he will  have to kill himself because he can not bare the pain; and

c.    Prison official refused to provide Gregory Stamper the pain medication needed, and he hanged himself and died.

407.    Plaintiff reserves paragraphs 407 through 500 for amendments if and when needed after obtaining discovery, or otherwise.

## CAUSES OF ACTION

### FIRST CLAIM – 42 U.S.C. SECTION 1983

501. Plaintiff fully incorporates herein by reference paragraphs 1 through 500 of this Complaint as if said paragraphs were fully set forth herein.

502. This First Claim is timely filed. The two year limitation period for this First Claim under 42 U.S.C. Section 1983 alleging an ongoing deliberate indifference, from March 16, 2011 through November 23, 2016, to Plaintiff's serious medical needs regarding Plaintiff's painful degenerative disc disease back injury did not begin to run until after November 23, 2016 when Defendants provided Plaintiff the treatment and surgery necessary.

503. Defendants Mohr, Eddy, Gardner, Bottorff, Rana, Houts, Artrip, Higginbotham, Free, Krisher, Desmarias and Does 1-50 have, under color of state law, knowingly and intentionally deprived the Plaintiff of his rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the U.S. Constitution including but not limited to the right to adequate medical care and the right to be free of cruel and unusual punishment regarding Plaintiff's painful degenerative disc disease back injury.

### SECOND CLAIM – 42 U.S.C. SECTION 1983

504. Plaintiff fully incorporates herein by reference paragraphs 1 through 503 of this Complaint as if said paragraphs were fully set forth herein.

505. This Second Claim is timely filed. The two year limitation period for this Second Claim under 42 U.S.C. Section 1983 alleging an ongoing deliberate indifference conspiracy, from March 16, 2011 through November 23, 2016, to Plaintiff's serious medical needs regarding Plaintiff's painful degenerative disc disease back injury did not begin to run until after November

23, 2016 when Defendants provided Plaintiff the necessary treatment and surgery.

506. Defendants Mohr, Eddy, Gardner, Bottorff, Rana, Houts, Artrip, Higginbotham, Free, Krisher, Desmarias and Does 1-50 have, under color of state law, knowingly and intentionally conspired to deprive the Plaintiff of his rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the U.S. Constitution including but not limited to the right to adequate medical care and the right to be free of cruel and unusual punishment regarding Plaintiff's painful degenerative disc disease back injury.

507. The Defendants referred to in paragraph 506 of this Complaint implemented this civil conspiracy by the acts alleged herein.

**THIRD CLAIM – 42 U.S.C. SECTION 1983**

508. Plaintiff fully incorporates herein by reference paragraphs 1 through 507 of this Complaint as if said paragraphs were fully set forth herein.

509. This Third Claim is timely filed. The two year limitation period for this Third Claim under 42 U.S.C. Section 1983 alleging an ongoing deliberate indifference, from July 2013 through April 19, 2017, to Plaintiff's serious medical needs regarding Plaintiff's painful re-broken right arm Humerus Bone injury did not begin to run until after April 19, 2017 when Defendants provided Plaintiff the treatment and surgery necessary.

510. Defendants Mohr, Eddy, Gardner, Rana, Artrip, Higginbotham, Free, Krisher, Desmarias Awan, Michelson, Krieger, Ryu, Yu and Does 1-50 have, under color of state law, knowingly and intentionally deprived the Plaintiff of his rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the U.S. Constitution including but not limited to the

right to adequate medical care and the right to be free of cruel and unusual punishment regarding

Plaintiff's painful re-broken right arm Humerus Bone injury.

## FOURTH CLAIM – 42 U.S.C. SECTION 1983

511. Plaintiff fully incorporates herein by reference paragraphs 1 through 510 of this Complaint

as if said paragraphs were fully set forth herein.

512. This Fourth Claim is timely filed. The two year limitation period for this Fourth Claim

under 42 U.S.C. Section 1983 alleging an ongoing deliberate indifference conspiracy, from July

2013 through April 19, 2017, to Plaintiff's serious medical needs regarding Plaintiff's painful re-

broken right arm Humerus Bone injury did not begin to run until after April 19, 2017 when

Defendants provided Plaintiff the treatment and surgery necessary.

513. Defendants Mohr, Eddy, Gardner, Rana, Artrip, Higginbotham, Free, Krisher, Desmarias

Awan, Michelson, Krieger, Ryu, Yu and Does 1-50 have, under color of state law, knowingly

and intentionally conspired to deprive the Plaintiff of his rights, privileges and immunities

secured by the Eighth and Fourteenth Amendments to the U.S. Constitution including but not

limited to the right to adequate medical care and the right to be free of cruel and unusual

punishment regarding Plaintiff's painful re-broken right arm Humerus Bone injury.

514. The Defendants referred to in paragraph 513 of this Complaint implemented this civil

conspiracy by the acts alleged herein.

## FIFTH CLAIM: PUNITIVE DAMAGES

515. Plaintiff fully incorporates herein by reference paragraphs 1 through 514 of this Complaint

as if said paragraphs were fully set forth herein.

516. Defendants Mohr, Eddy, Gardner, Bottorff, Rana, Houts, Artrip, Higginbotham, Free, Krisher, Desmarias and Does 1-50's conduct towards Plaintiff Mark Grove to Plaintiff's serious medical needs regarding Plaintiff's painful degenerative disc disease back injury entitles Plaintiff Mark Grove to punitive damages from said Defendants, since Defendants were aware of Plaintiff's suffering and the deliberate indifference to Plaintiff's serious medical needs and Defendants did knowingly and purposefully delay Plaintiff access to a qualified physician, treatment, and surgery from March 16, 2011 through November 23, 2016 (approximately six years).

517. As a result of the malicious and intentional and deliberate acts, omissions, and conduct of Defendants Mohr, Eddy, Gardner, Bottorff, Rana, Houts, Artrip, Higginbotham, Free, Krisher, Desmarias and Does 1-50, each of them individually and collectively, complained of herein committed willfully, knowingly, purposely, unlawfully, maliciously, with malice or reckless indifference, and in wanton disregard of the rights and medical needs of the Plaintiff, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution including but not limited to the right to adequate medical care and the right to be free of cruel and unusual punishment regarding Plaintiff's painful degenerative disc disease back injury, punitive damages are reasonable in this case.

## SIXTH CLAIM: PUNITIVE DAMAGES

518. Plaintiff fully incorporates herein by reference paragraphs 1 through 517 of this Complaint as if said paragraphs were fully set forth herein.

519. Defendants Mohr, Eddy, Gardner, Rana, Artrip, Higginbotham, Free, Krisher, Desmarias

85

Awan, Michelson, Krieger, Ryu, Yu and Does 1-50's conduct towards Plaintiff Mark Grove to

Plaintiff's serious medical needs regarding Plaintiff's painful re-broken right arm Humerus Bone

injury entitles Plaintiff Mark Grove to punitive damages from said Defendants, since Defendants

were aware of Plaintiff's suffering and the deliberate indifference to Plaintiff's serious medical

needs and Defendants did knowingly and purposefully delay Plaintiff access to a qualified

physician, treatment, and surgery from July 2013 through April 19, 2017 (approximately four

years).

520. As a result of the malicious and intentional and deliberate acts, omissions, and conduct of

Defendants Mohr, Eddy, Gardner, Rana, Artrip, Higginbotham, Free, Krisher, Desmarias Awan,

Michelson, Krieger, Ryu, Yu and Does 1-50, each of them individually and collectively,

complained of herein committed willfully, knowingly, purposely, unlawfully, maliciously, with

malice or reckless indifference, and in wanton disregard of the rights and medical needs of the

Plaintiff, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution

including but not limited to the right to adequate medical care and the right to be free of cruel

and unusual punishment regarding Plaintiff's painful re-broken right arm Humerus Bone injury,

punitive damages are reasonable in this case.

SEVENTH CLAIM-STATE LAW CLAIM OF FRAUD

521. Plaintiff fully incorporates herein by reference paragraphs 1 through 520 of this Complaint as if said paragraphs were fully set forth herein.

522. Beginning on June 26, 2015, through April 19, 2017, Defendants Mohr, Eddy, Gardner, Rana, Airtrip, Higginbotham, Free, Krisher, Desmarias, Awan, Michelson, Krieger, Ryu, Yu and Does 1-50, acting individually and collectively, tortiously interfered with Plaintiff's ability to receive adequate medical care and committed fraud when said Defendants knowingly and purposely falsely concealed the facts stated in paragraphs 223-223(c), 232, 240(b)(d) and 302-302(d) of this Complaint.

523. All Defendants referred to in paragraph 522 of this Complaint knowingly and purposely committed the fraudulent acts and/or omissions stated in paragraph 522 of this Complaint so said Defendants could:

a) save the ODRC money on prisoner's health care costs;

b) avoid reprimand or termination of their employment by their supervising officials for violating ODRC and OSUMC contracts, policies, regulations, protocols, customs and usuages;

c) Plaintiff re-iterates and fully incorporates herein by reference paragraphs 302(a) through 303 of this Complaint as if said paragraphs were fully set forth herein;

d) Plaintiff re-iterates and fully incorporates herein by reference paragraphs 302(a)(b)(e) of this Complaint as if said paragraphs were fully set forth herein.

87

524. As a result of said Defendants concealment and false and misleading representations, Plaintiff has suffered unnecessary pain, risk of serious harm, emotional distress and a marked deterioration of Plaintiff's overall health.

525. The statute of limitations on fraud according to ORC 2305.09(c) is four years.

526. Four years have not passed since the June 26, 2015, through April 19, 2017, representations which constitutes the fraud alleged herein.

527. The principle of equitable tolling states that a statute of limitations shall not bar a claim in cases where the Plaintiff, despite the use of due diligence, could not or did not discover the injury until after the expiration period. Four years have not passed since Plaintiff discovered the injury.

528. All Defendants referred to in paragraph 522 of this Complaint concealed facts and made false and misleading representations of facts to Plaintiff and others regarding Plaintiff's entitlement to adequate medical care for Plaintiff's re-broken right arm humerus bone injury. This constitutes fraud. As a result, Plaintiff is entitled to recover.

529. Plaintiff fully incorporates herein by reference paragraphs 1 through 528 of this Complaint as if said paragraphs were fully set forth herein and alleges that the Defendants referred to in paragraph 522 of this Complaint conspired to commit the fraud alleged in paragraphs 521 through 528 of this Complaint.

EIGHTH CLAIM-STATE LAW CLAIM OF NEGLIGENCE

530. Plaintiff fully incorporates herein by reference paragraphs 1 through 529 of this Complaint as if said paragraphs were fully set forth herein.

531. Beginning on June 26, 2015, through April 19, 2017, Defendants Mohr, Eddy, Gardner, Rana, Artrip, Higginbotham, Krisher, Desmarias, Awan, Michelson, Krieger, Ryu, Yu and Does 1-50, acting individually and collectively negligently interfered with Plaintiff's ability to receive adequate medical care regarding Plaintiff's painful, re-broken, re-severed, right arm humerus bone injury when said Defendants refused to and failed to provide Plaintiff the necessary surgery until April 19, 2017.

532. As a result of the negligent acts and omissions of said Defendants, Plaintiff has suffered unnecessary pain, risk of serious harm, emotional distress and a marked deterioration of Plaintiff's overall health.

533. All Defendants referred to in paragraph 531 of this Complaint are physicians, nurse practitioners and health-care providers under Ohio law.

534. An action for medical negligence and/or medical malpractice against a physician, nurse practitioner, health-care provider or hospital shall be brought within one year after the cause thereof accrued. See ORC 2305.11 and 2305.11(A).

535. Under ORC 2305.11 and 2305.11(A), a cause of action for negligence and/or medical malpractice accrues and the one-year statute of limitations commences to run: a) when the patient discovers or, in the exerciser of reasonable diligence should have discovered, the resulting injury, or b) when the physician/patient relationship for that condition terminates, whichever occurs later.

536. Under ODRC and OSUMC contracts, policies, regulations, protocols, customs and usages, the physician/patient relationship for Plaintiff's painful, re-broken, re-severed right arm humerus bone injury for all Defendants referred to in paragraph 531 of this Complaint did not terminate until March 1, 2018, when Defendant Awan released Plaintiff from the Defendant's medical care regarding said injury.

537. One year has not passed since said Defendants terminated the physician/patient relationship for Plaintiff's painful, re-broken, re-severed right arm humerus bone injury on March 1, 2018. Plaintiff's negligence claims are timely filed.

## DEMAND FOR TRIAL BY JURY

521.    Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mark Grove respectfully prays that judgment be entered in his favor against the Defendants, each of them individually and collectively, as follows:

(A)    Declare that Defendants subjected the Plaintiff to conditions and engaged in conduct which caused Plaintiff to be subjected to the deprivation of one or more of his constitutional rights as alleged herein;

(B)    Declare that the Eighth Amendment requires the Defendants to have the Plaintiff and all other similarly situated prisoners, who have serious painful medical conditions, examined by a qualified physician when the physician who has examined Plaintiff and said prisoners has already determined that Plaintiff's and said prisoners' serious painful medical conditions are beyond the scope of the examining physicians medical qualifications and a medical specialist is needed to diagnose and treat Plaintiff's and said prisoners' serious painful medical conditions.

(C)    Permanently enjoin the practice of Defendants from continuing:

(1)    to apply ODRC policies, regulations, protocols, contracts, customs and usages that prohibit the physicians who actually see and examine Plaintiff's and other similarly situated ODRC prisoners' serious medical conditions from requiring and ensuring that Plaintiff and said prisoners be examined and treated by a qualified physician when the examining physicians have determined that Plaintiff's and said prisoners' serious medical conditions are beyond the scope of the examining physicians medical qualifications and a medical specialist is needed to diagnose and treat Plaintiff's and said prisoners' serious medical conditions;

89

(2)     to apply ODRC policies, regulations, protocols, contracts, customs and usages that interfere with the examining physicians prescribed treatment plan;

(3)     to apply ODRC policies, regulations, protocols, contracts, customs and usages that require the decision, whether or not to provide Plaintiff and said prisoners access to an examination by a medical specialist physician having the medical qualifications required to diagnose and treat Plaintiff's and said prisoners' serious medical conditions, to be made by ODRC physicians and other ODRC agents who:

(a)     do not examine Plaintiff and said prisoners before making the decision to deny Plaintiff and said prisoners access to the required medical specialist physician, and/or;

(b)     are acting beyond the scope of their medical qualifications when making the decision to deny Plaintiff and said prisoners access to the required medical specialist physician;

(4)     to require the decision, whether or not to provide Plaintiff and said prisoners access to an examination by a medical specialist physician having the medical qualifications required to diagnose and treat Plaintiff's and said prisoners' serious medical conditions, to be made by ODRC physicians and other ODRC agents who:

(a)     do not examine Plaintiff's and said prisoners before making the decision to deny Plaintiff and said prisoners access to the required medical specialist physician, and/or,

(b)     are acting beyond the scope of their medical qualifications when making the decision to deny Plaintiff and said prisoners access to the required medical specialist physician;

(D)     An award to Plaintiff of compensatory damages in an amount to be shown at trial, but

believed to be in excess of three million ($ 3,000,000.00) U.S. dollars);

(E)     An award to Plaintiff of punitive damages in an amount to be shown at trial, but believed

to be in excess of three million ($ 3,000,000.00) U.S. dollars;

(F)     An award to Plaintiff of the cost of this action;

(G)     An award to Plaintiff of the cost of his attorney's fees;

(H)     An award to Plaintiff of the cost of expert witness fees; and

(I)     All other relief that is just and proper.

Respectfully Submitted,

Mark Grove, #183624
Plaintiff, pro se
Chillicothe Correctional Institution
P.O. Box 5500
Chillicothe, OH 45601


## VERIFICATION

I verify that these facts are true to the best of my knowledge and belief.

Mark Grove